# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

MAURICE JOHNSON                )
                               )        Case No. 1:18-cv-204
                Petitioner,    )
                               )        Judge Travis R. McDonough
v.                             )
                               )        Magistrate Judge Susan K. Lee
MIKE PARRIS,                   )
                               )
                Respondent.    )
                               )

---

## MEMORANDUM OPINION

---

This is a prisoner's pro se petition for habeas corpus relief under 28 U.S.C. § 2254 in which Petitioner challenges his convictions for three counts of felony murder. After reviewing the relevant filings, including the state court record, the Court finds that the record establishes that Petitioner is not entitled to relief under § 2254. Accordingly, no evidentiary hearing is warranted, *see* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), the petition for habeas corpus relief will be **DENIED**, and this action will be **DISMISSED**.

## I.      BACKGROUND

In its opinion affirming Petitioner's three felony-murder convictions in the Bradley County Criminal Court before then-Judge Amy Reedy on direct appeal, the Tennessee Criminal Court of Appeals ("TCCA") summarized the relevant facts underlying those convictions as follows:

> This case arises from the February 14, 1999 shooting deaths of Orienthal James ("OJ") Blair, Cayci Higgins, and Dawn Rogers ("the victims") in a townhouse in

Cleveland. On October 8, 2008, a Bradley County grand jury indicted [Petitioner] and two co-defendants, Michael Younger and Twanna "Tart" Blair, for conspiracy to commit especially aggravated robbery, especially aggravated robbery, and three counts of first degree murder in the perpetration of an especially aggravated robbery. The court severed their trials, and [Petitioner] proceeded to trial in August 2009.

On the morning of February 14, 1999, Twanna Blair placed a call to Bradley County 911, informing them that she had been shot and that three other people had been killed. Officers responded to the scene, a townhouse in Cleveland, and discovered three victims lying on the living room floor. Emergency personnel rendered aid to Twanna Blair, who was found in the upstairs of the townhouse. The three victims were all deceased as a result of gunshot wounds to the head and/or neck.

Eric Hampton was a detective with the Cleveland Police Department and was the lead investigator into the triple homicides for some time []. Upon arriving at the scene, Det. Hampton observed that the kitchen door had been forcibly opened and that there were items on the kitchen floor, including a knife, a cordless phone, and black wire "flex" ties. He further described the condition of the townhouse as follows: "There did not appear to be anything disarrayed or ransacked, . . . and upstairs was pretty much, if I can remember correctly, several bedrooms and nothing gone through or looked to be ransacked as well."

Raymond DePriest, formerly with the Tennessee Bureau of Investigation ("TBI") and employed with the Nashville Police Department as the Forensic Quality Assurance Manager at the time of trial, testified that, at the end of processing a crime scene, the TBI "always" conducted a search for contraband. Agents look "through every drawer, every cabinet in the house, . . . go through the washer and dryer just looking for any evidence that may be present[.]" After searching the Cleveland townhouse, agents did not find any evidence of controlled substances being present in the residence.

TBI Special Agent Luke Mahonen, a detective with the Cleveland Police Department at the time of the murders, testified that, on February 14, 1999, he responded to the triple homicide call and shot the initial crime scene video. Agent Mahonen described what he would typically look for at a crime scene: "One would have looked for items of value missing, items of value being present, ways that entry could have been made, whether the doors were locked or unlocked, signs of struggle, wallets, purses, things of that nature, currency, jewelry, things of value." When asked if he recalled finding any money at the scene, Agent Mahonen replied, "I don't recall, no."

The TBI sent a mobile crime scene unit to the townhouse to collect any possible forensic evidence. Agents recovered numerous items from the residence: clothing found at the top of the stairs belonging to Twanna Blair, wire ties, a cordless

phone, a kitchen knife, a beer bottle near the back door, a "latch plate" from the back door, a fired .22 caliber bullet, fired and unfired .22 caliber cartridge cases, and a 9mm caliber bullet. DNA testing on blood samples recovered from inside the house revealed that the three victims or Twanna Blair were the sources of the samples. Only one unidentified sample was found inside the house, DNA present on a stamp, and it was never matched to anyone.

As result of the ensuing investigation, officers learned of an altercation between [Petitioner] and OJ Blair just two days prior to the murder. Tamara Rhea testified that, on the evening of February 12, 1999, she threw a party at her residence in Sweetwater and that about 100 people were in attendance.

Reginald Constant, OJ's cousin, testified that he was in custody being held as a material witness and that he had no criminal charges. Mr. Constant stated that he was at the February 12 party in Sweetwater, where he saw OJ Blair and [Petitioner] involved in an altercation. Mr. Constant and several others "broke up" the fight. While standing in the yard, the group heard gunshots. According to Mr. Constant, [Petitioner] then pulled out his gun and pointed it toward the porch. Mr. Constant said to [Petitioner], "No, man it ain't even worth it," to which [Petitioner] replied, "You are going to let them shoot at me and I can't shoot back." Mr. Constant responded, "Man, that's my cousin." [Petitioner] then got in his vehicle and left. Mr. Constant stated that he was never afraid of [Petitioner] because he had known [Petitioner] for nineteen years and did not think he would shoot him. After [Petitioner] left, Mr. Constant also left the party before the police arrived.

Charles Brewster, Jr., was also in custody, being detained for the purpose of testifying at [Petitioner]'s trial. Mr. Brewster was likewise in attendance at the February 12 party, where he witnessed two females get into a physical altercation. Mr. Brewster testified that he saw [Petitioner] and OJ Blair get into a verbal argument, overhearing the two men doing a "bunch of cussing[.]" When he again saw [Petitioner] on Saturday afternoon following the party, [Petitioner] said to him "[t]hat he had handled the situation. He retaliated and handled the situation."

Desmond Deane Benton also testified about his recollection of the February 12 party. He recalled that [Petitioner] and OJ Blair were "in each other's face. They was [sic] arguing and then all of the sudden they grabbed each other and they rolled out the front door off the porch onto the concrete, the driveway . . . . They started fighting and then shots broke out." According to Mr. Benton, when the shots were fired, everybody ran. Mr. Benton opined that OJ Blair was winning the fight.

Mr. Benton left the party and went to his girlfriend's house. Sometime later that evening, he returned to Tamara Rhea's apartment and saw Michael Younger at the trunk of his car, loading bullets into the clip of a black handgun. Mr. Benton stated that he had never seen [Petitioner] with a gun.

3

After shots were fired at the party, officers were called to the scene, which, according to Officer Kenny Wilkins with the Sweetwater Police Department, was known for its drug activity. As Officer Wilkins was traveling to the scene, he encountered Ke[rr]y Rogers, who had been shot at the party. Officer Wilkins stayed with Mr. Rogers until emergency personnel arrived to assist him. Despite a lengthy investigation, no one was ever charged with Mr. Rogers' shooting.

While Officer Wilkins waited with Mr. Rogers, other officers continued to the scene "where the party had taken place." Once at the party, the officers arrested [Petitioner] and took him to the local jail for questioning.

On February 14, 1999, around 2:00 a.m., Stacy Ann Clabough left The Party Zone, a club in Chattanooga, after Twanna Blair, OJ Blair, and Dawn Rogers failed to meet her there. When she returned to Cleveland, she went by the victims' townhouse to see why they had failed to attend. She knocked on the front door, and Twanna Blair answered. Twanna Blair told her that everyone was asleep, so Ms. Clabough returned to her car and left. As she was leaving the complex, she heard "a noise or something" that "caught [her] attention[.]" She turned to see someone sitting inside a dark, maroon vehicle. While she did not know [Petitioner] at that time, she was able to later identify him as the man inside the car; she claimed she was able to remember [Petitioner's] face due to the "shock." At the time of trial, Ms. Calbough was incarcerated for violating her probation on a prescription fraud conviction. Ms. Clabough also admitted that she had given several inconsistent statements to the authorities, that she had two forgery convictions, and that she had a tattoo commemorating OJ Blair's birth date.

Amy Lonas and [Petitioner] were in "a friend with benefits relationship" in February 1999. Ms. Lonas, then eighteen years old, stated that, on the evening of the 12th, she was present at the party with [Petitioner] and Michael Younger. She testified that she saw [Petitioner] with a gun that evening and, according to Ms. Lonas, [Petitioner] "always had a gun." When OJ Blair and Twanna Blair arrived at the party, [Petitioner] said to Ms. Lonas, "They could die right there." Ms. Lonas and others told [Petitioner] "No, don't do nothing like that." Ms. Lonas, who was underage and drinking and doing "a lot" of drugs, went back inside the house. After she heard gunshots, she left the party to avoid the police and returned to her apartment that she shared with Tiffany Gray.

At approximately 2:00 a.m. on February 13, [Petitioner], Michael Younger, and Jason McGaughey came to Ms. Lonas' apartment. All of the men were intoxicated, and Younger hit the front door so hard it fell off the hinges. Ms. Lonas stated that her apartment complex was "run down" and that the door was not in good condition at the time. Ms. Lonas became upset because she did not want to have to tell her roommate about the door. Mr. McGaughey stayed to fix the door.

According to Ms. Lonas, [Petitioner] was agitated while he was at her apartment, and the men stayed approximately one and half to two hours. While there that morning, Ms. Lonas and [Petitioner] engaged in conversation. When discussing where [Petitioner] was headed once leaving her apartment, he said that "he was going to get his money back." Ms. Lonas then asked [Petitioner] "how much dope did you front him." [Petitioner] replied that "it was none of [her] business." The men left the apartment on foot. The following day, February 14, Ms. Lonas learned of the triple homicide from the television news.

Around 7:00 or 8:00 a.m on February 15, Ms. Lonas was taking out her trash, when she saw [Petitioner]. Although [Petitioner] was hostile, they again engaged in conversation. Ms. Lonas was upset with [Petitioner] because he had been having sex with another woman. When talking about where he had been, [Petitioner] said that "he had took [sic] care of it, . . . that he went to go get his money back, . . . he had done something real bad, . . . he was going to have to go away for a little while." [Petitioner] described his arrival at the townhouse to Ms. Lonas: "Twanna knew he was coming, they knocked on the door like the police to get in the door, . . . that it was only OJ in that house." According to [Petitioner], OJ pulled a gun on him first so he had to shoot in "self-defense." [Petitioner] told Ms. Lonas that OJ was alive when he left the apartment and that, afterwards, he threw his gun in the Loudon County rock quarry. [Petitioner] warned Ms. Lonas that she should "never tell anybody anything" about what he had told her or he would kill her. The two got into "an irate argument" and decided to no longer be friends. Ms. Lonas agreed to never tell anyone about what [Petitioner] had told her.

Ms. Lonas admitted that she had criminal convictions for criminal impersonation in 1998 and shoplifting in 1999. According to Ms. Lonas, she had since "changed [her] whole life" beginning in 2006. Ms. Lonas stated that she was now in college, studying medical assistance and medical billing, and had been a Certified Nurse's Assistant for the past three years. The police "found" her in 2006, and she then told the truth about what she knew about the murders. However, on cross-examination, Ms. Lonas acknowledged additional convictions for passing a worthless check and leaving the scene of an accident in 2006 and a simple possession charge in 2008.

Ranessa Macon testified that [Petitioner] visited her on Sunday morning February 14. He woke her up, asked her to sit on the couch, and told her he had killed someone. After hearing the news, [Petitioner] and Ms. Macon just stood in the middle of the room and hugged each other. She did not ask any further questions of [Petitioner] about what he had done. She admitted that, back in 1999, she was "using drugs pretty heavily[.]"

Tamara Rhea spoke with [Petitioner] a few days after the shootings, and [Petitioner] was apologetic about fighting at Ms. Rhea's party. Ms. Rhea asked

5

[Petitioner] about the shootings, inquiring, "Did you have anything to do with that?" [Petitioner] jokingly said, "You never know."

Approximately a week or two prior to the party in Sweetwater, [Petitioner] told Analesha Harper that he had been beaten and robbed, but he did not know the perpetrator. [Petitioner] again visited Ms. Harper sometime after the February 12 party. He told her that an altercation happened at the party, that OJ Blair "was there," and that he was drunk at the time. According to Ms. Harper, [Petitioner] did not know who robbed him a few weeks prior to the party in 1999.

[Petitioner] again visited Ms. Harper in early 2006 and, according to Ms. Harper, [Petitioner] was upset because the television news had linked him to the murders. When Ms. Harper was asked if [Petitioner] ever told her at a later date "who he thought had something to do with" the robbery that happened just a week or two prior to the party, she replied, "When I asked him about the murders he was like the guy OJ remember, that was the guy that I had the fight with[.]" Ms. Harper asked [Petitioner] if he had anything to do with the murders, and he told her "no." Ms. Harper stated on cross-examination that she did not believe [Petitioner] ever knew who robbed him in 1999.

Vanessa Latham testified that, in February 1999, she was having a relationship with [Petitioner], that they "messed around for a long time." Ms. Latham was in attendance at the party at Tamara Rhea's house. Ms. Latham caught the end of the fight between OJ Blair and [Petitioner]. To Ms. Latham, it looked like OJ Blair was "whipping" [Petitioner]. When she heard gunshots, she went to a neighbor's house.

After the murders, Ms. Latham talked with [Petitioner] in "Jake's parking lot"; they were "just chilling[.]" [Petitioner] asked Ms. Latham if she knew "that guy from Cleveland," to which she responded affirmatively, and [Petitioner] then said "we did that." Ms. Latham became upset because she had heard that one of the girls was pregnant. After she got upset, [Petitioner] said that "the fucking bitch shouldn't have had her ass there[.]" He then threatened to kill Ms. Latham if she ever told anyone about what he had told her. Ms. Latham stated that she did not believe [Petitioner] about the killings, that she did not know him to be bad person, and that she did not know "if he was joking around or not."

Several years later, Ms. Latham was contacted by the police. She claimed that the authorities were threatening to put her in jail and take her kids away if she did not cooperate, so she agreed to make a recorded phone call to [Petitioner]. Detective Duff Brumley of the Cleveland Police Department, who had taken over the investigation of the triple homicides after Det. Hampton's departure, was present when Ms. Latham placed the call to [Petitioner]. According to Det. Brumley, in the first phone call, [Petitioner] was "very reluctant to speak, was evasive, and asked Ms. Latham to go to a pay phone and call him or to a secure phone because he was afraid that his phone had been wire tapped." They then went to a pay

6

phone, and Ms. Latham again phoned [Petitioner]. A recording of this call was played for the jury. During the phone call, [Petitioner] stated, "Now, Vanessa, listening [sic] to what I'm saying. Regardless of what me and you talked about nobody is going to know but me and you. Do you understand that?"

Stacy Marvin King testified that he had known [Petitioner] since they were teenagers. Mr. King was incarcerated at the time of trial and had been since March 2006. Mr. King testified that, in February 2006, he was on his way home from work, when he stopped at an Applebee's restaurant in Athens to eat. There he saw [Petitioner], and the two men spoke about the triple homicides in Cleveland in February 1999. According to Mr. King, [Petitioner] was "agitated with regard to the talk on the streets." [Petitioner] said to Mr. King that "he wanted to resolve a problem he had, which was an individual still being alive and talking about events surrounding the murder." That individual was Twanna Blair.

While talking at Applebee's, [Petitioner] described the murders to Mr. King. [Petitioner] told him that, upon entry into the residence, he fired a shot at OJ Blair, killing him. [Petitioner] continued, "[W]e heard a noise upstairs, we got the individuals upstairs," and "they were shot with the intent of not leaving anyone alive[.]" According to Mr. King, [Petitioner] stated that his "negative situation . . . was only going to get worse" if he "didn't take out Ms. Blair[.]"

Mr. King acknowledged that he had been incarcerated many times; his current incarceration due to a federal firearms charge. He had multiple convictions for selling cocaine and firearm possession and had violated his probation several times. Mr. King confirmed that the federal prosecutor had filed a "5K1" motion on his behalf, stating that Mr. King had provided "substantial cooperation." Upon this motion, a federal judge can reduce a defendant's sentence.

Mark Blair testified that he was locked up in the Monroe County Jail in February 1999. He testified that he spoke with [Petitioner] by telephone during that time, and [Petitioner] told him "that he had killed some people." On another occasion, he and [Petitioner] were walking around the track at the jail and talking, and [Petitioner] informed him that, when he got out of jail, he was going "put down a demo[.]" Mark Blair replied, "When you get out, . . . them youngsters ain't going to let you come out there and regulate or nothing." [Petitioner] then said, "I ain't worried about what them youngsters think, . . . if they get in the way I will do them just like me and Money did down in Cleveland." According to Mark Blair, Michael Younger was also known as "Money." [Petitioner] extrapolated to Mark Blair that he "handled the matter in Cleveland" after getting into a fight with OJ Blair at a party in Sweetwater. Mark Blair acknowledged that he had significant criminal history, including convictions for firearm possession, selling cocaine, aggravated assault, and evading arrest. He stated that he contacted the authorities with this information and confirmed that he did hope to receive some favorable treatment based on his cooperation.

In 2001, Agent Mahonen began working with the TBI. Agent Mahonen obtained a wiretapping order for [Petitioner's] cellular phone, and he had recorded over 300 of [Petitioner's] telephone calls. Agent Mahonen selected one phone call in particular to play for the jury; it was an incoming call, placed from Jewelry Television, Incorporated, made on February 14, 2006, at 10:47 a.m. Agent Mahonen believed that [Petitioner] was convicted of federal drug charges based upon information obtained during the wiretap of [Petitioner's] phone. Agent Mahonen also agreed that, on more than one occasion, [Petitioner] gave blood samples, hair samples, and fingerprints to the authorities.

In the years after the murders, TBI Special Agent Terry Arney, an expert in firearms identification, had been unable to match the cartridge cases or bullets from the scene to any particular weapon. Testing continued as late as 2007.

Following testimony from twenty-five witnesses, the State concluded its proof. [Petitioner] then made a motion for judgment of acquittal on all counts. The court dismissed the conspiracy charge, but the other counts were to be submitted to the jury. [Petitioner] then submitted proof in his defense.

Jason Juan McGaughey testified on behalf of [Petitioner]. He confirmed that he had drug convictions and a criminal history spanning approximately eighteen years. Mr. McGaughey testified that he did not attend the party in Sweetwater. He did recall a visit to Ms. Lonas' apartment when he "messed her door up and she was tripping about her friend was going to put her out because the door was messed up." McGaughey testified that he was accompanied by Michael Younger, but [Petitioner] was not with him on that occasion. Mr. McGaughey fixed the door, and they left.

[Petitioner] testified and gave his version of the events. He admitted that, at the time of the murders, he sold drugs and had sexual relationships with a lot of women. [Petitioner] denied any involvement in the murders.

According to [Petitioner], he supplied the alcohol for Tamara Rhea's party on the evening of February 12, 1999. He did not take his gun to the party, and he did not know OJ Blair prior to the party. He had heard that some "people from Cleveland had arrived at this party[.]" [Petitioner] claimed he was watching two women fight when someone punched him in the back of the head. He turned to see three or four people hitting him and, as he was attempting to ward of[f] the blows, the fight moved into the yard. One person "just kept coming" at him. Someone then fired a gun, and his attacker ran into the house. He did not recognize any of the men who attacked him.

[Petitioner] was arrested after officers arrived at the scene of the party, and he was transported to the police station. Officers tested his hands for gunshot residue but did not find any, and [Petitioner] was never charged with any offense connected to the party. After being released from the police station, [Petitioner] walked to

the hospital to see who had been shot. A lot of people from the party had gathered at the hospital, and he learned Kerry Rogers was the individual who had been shot. [Petitioner] and others waited until Mr. Rogers was released from the hospital. The [Petitioner] then returned to the party, which had moved "two doors down from where the party" had originally begun. He drank and talked with people for two to three hours following his return.

[Petitioner] testified that, after the killings, he gave two statements to the police. When the police questioned him a third time, he refused to cooperate. He confirmed that, several years later, he was in federal prison with Mark Blair and that they talked "all the time." [Petitioner] denied ever making any incriminating statements to Mark Blair. After his release from federal custody, he did give a third statement to police. He also gave his fingerprints and DNA sample to authorities.

Following the conclusion of the proof, the jury found [Petitioner] guilty of the remaining four charges—especially aggravated robbery and three counts of first degree murder during the perpetration of an especially aggravated robbery. [Petitioner] was sentenced to life without the possibility of parole for each of the murder convictions. For the especially aggravated robbery conviction, the trial court imposed a sentence of twenty-five years at 100% to run concurrently with the life sentences.

*State v. Johnson*, No. E-2010-01142-CCA-R3CD, 2011 WL 3586557, at *1–8 (Tenn. Crim. App.

Aug. 16, 2011), *perm. app. denied*, (Tenn. Dec. 11, 2011) ("*Johnson I*"). The TCCA then

reversed Petitioner's especially aggravated robbery conviction, finding the evidence was

insufficient to support that conviction, but affirmed Petitioner's three felony-murder convictions,

finding that the evidence sufficiently established that he committed the murders in an attempted

especially aggravated robbery, although the statute of limitations had run for such a charge. *Id.*

at *8–13.

While Petitioner's direct appeal of his convictions was pending, various developments in

the case against Michael Younger occurred, and in its opinion affirming the denial of Petitioner's

post-conviction petition, the TCCA summarized these events and their effect on Petitioner's

direct appeal of his convictions as follows:

*Defendant Younger's case*

9

In order to put a number of [] Petitioner's post-conviction issues into proper context, we must also consider the procedural history in co-defendant Michael Younger's case. Defendant Younger's trial began in May 2010. On July 17, 2010, Defendant Younger filed a Motion for Interlocutory Appeal in this court. In granting Defendant Younger's Motion for Interlocutory Appeal, this court explained:

> Prior to and during trial, [D]efendant [Younger] filed two motions to dismiss the indictment, arguing prosecutorial misconduct in the form of *Brady* violations. One of the violations concerned the State's failure to turn over evidence of a State's witness, Anita Wilson, facing multiple charges for check fraud. The trial court found that violation egregious enough to order defense counsel to report the prosecutors to the Board of Professional Responsibility and the prosecutors to self[-]report the violation. Nevertheless, the court denied the [Defendant Younger's] motion to dismiss the indictment. As trial progressed, the State, on redirect examination, asked a witness, Pam Upton, a question about [Defendant Younger] being a "drug dealer," which question had been specifically prohibited by the trial court prior to trial during a Rule 404(b) hearing. When [Defendant Younger] objected, the prosecutor admitted he "decided" to ask the question based upon the defense's cross[-]examination of the witness. [Defendant Younger] again requested the trial court dismiss the indictment. The court recognized the State's error but refused to dismiss the indictment. At that point, [Defendant Younger] requested a mistrial, arguing that the defendant had been "goaded" into making the request by the State's continued bad behavior. The trial court found that the "improper testimony [about Defendant Younger's and [] Petitioner's drug dealing] was directly solicited by the [S]tate's question" against the trial court's ruling prohibiting that line of questioning. The court further noted that there was little proof in the record linking [Defendant Younger] with the crime. The court found that a curative instruction would be insufficient to mitigate the error, stating, "I can't put the prejudicial proof back in the mouth of the witness." Accordingly, the trial court granted [Defendant Younger's] motion for mistrial.

*See State v. Michael Younger*, No. E2010–01541–CCA–R9–DD (Tenn. Crim. App. Oct. 11, 2010) (order granting interlocutory appeal).

In late June 2010, the State informed Defendant Younger's attorneys about an investigation into improper actions by Detective Duff Brumley. The actions which led to the investigation and, ultimately, Detective Brumley's firing were unrelated to the instant case. However, a letter from the District Attorney's Office to Defendant Younger's attorneys also referenced the following:

10

In an unrelated matter, and in light of these recent events, I must also relate to you a conversation that I had with Detective Brumley some weeks before our 404(b) hearing in Bradley County in this case. Detective Brumley contacted me late in the evening and informed me that he had some really great news. He said that he had been talking with a "little birdy," and he knew how we could get into evidence a person's prior statement, even if they now claim memory loss. I knew of no such extant rule of evidence that would allow us to do so. Detective Brumley told me the exact Rule of Evidence number and subpart, read it to me, and explained that it was a brand new Rule of Evidence. He further said that his "little birdy" said she did not know why the State had not sought to use this new Rule of Evidence in the State's previous cases, as it had been passed prior to that trial. He said at the time that she did not give him the Rule number, but that she said it was a new rule and the only significant new rule passed that year. From there, Detective Brumley stated that he looked it up on the web search engine Google. Although Detective Brumley would not tell me the name of his "little birdy" friend who gave him this information, he did reveal that it was a female who was intimately aware of the state's case, all motions that had been filed by the state, all motions that had not been filed by the state, and who was aware of the passage of new Rules of Evidence.

Following these revelations, the State filed a Motion to Enter Nolle Prosequi ("Motion to Nolle") in Defendant Younger's case on October 19, 2010. The State's motion alleged:

1. The prosecuting officer in this case, [Detective] Duff Brumley, is currently under investigation for actions taken in his official capacity as a Cleveland Police Department officer. [Detective] Brumley has been terminated from his employment by the Cleveland Police Department.

2. In the course of the current investigation of [Detective] Brumley, three prior instances have been found which call into serious question [Detective] Brumley's credibility as a witness.

3. The first instance involved a prior homicide investigation wherein [Detective] Brumley testified under oath that he turned over recorded statements of a suspect directly to an Assistant District Attorney General. However, in subsequent interviews, [Detective] Brumley gave inconsistent answers about who received the recorded statements. Ultimately it was determined that

[Detective] Brumley did not give the recorded statements directly to an Assistant District Attorney General as he claimed under oath.

4. The second instance involved a federal court [c]ase, *United States v. Tiffany Little*, wherein Magistrate Judge Carter in a written opinion detailed numerous inconsistent statements made by [Detective] Brumley in his sworn testimony. These inconsistent statements included material facts that were important to a fair determination of the issues in the case and ultimately resulted in Magistrate Carter finding that he could place no confidence in the accuracy of [Detective] Brumley's memory. The case was subsequently dismissed.

5. In the current case, Anita Wilson, a key witness, has given a statement to counsel for the defense that [Detective] Brumley coerced her into claiming that [Defendant] Younger confessed to the murders. Counsel for the defendant brought this to the State's attention along with the fact that Ms. Wilson was held on a fugitive from justice warrant at [Detective] Brumley's direction. Subsequent investigation has found that Ms. Wilson was in fact held on a fugitive from justice warrant even though she was not wanted in another state. Her detention on a fugitive from justice charge was illegal. It certainly could be inferred that the illegal detention was intentional to give [Detective] Brumley additional leverage in taking the coercive actions that Ms. Wilson now maintains happened.

6. Ms. Wilson had given a prior statement in 2004 to Lieutenant Mark Gibson of the Cleveland Police Department. In that statement, Ms. Wilson makes no mention whatsoever of [Defendant] Younger confessing to the crimes in question. The presence of this prior inconsistent statement lends credence to Ms. Wilson's claims that she was coerced to give her latest statement incriminating [Defendant] Younger.

7. Following the previous trial of [Defendant] Younger which ended in a mistrial, [Detective] Brumley returned several pieces of evidence to the Cleveland Police Department. Rather than return the items to the evidence room as he should have done, [Detective] Brumley left the items in his office which was not locked. As such, the chain of custody is irrevocably broken as to those items.

8. The State of Tennessee cannot in good faith call [Detective] Brumley to the stand to testify in this matter as his credibility as a witness has been severely compromised.

9. Finally, and most disturbing, is approximately one hundred and seventy-one (171) telephone calls between [Detective] Brumley and Judge Amy Reedy, the presiding judge, during the time this case was progressing through the court system. A summary of the telephone calls has been attached as EXHIBIT 1.

10. While the State believes firmly that [Defendant] Younger is responsible for the deaths of the victims in this case, [Defendant] Younger is entitled to due process and a fair trial. No matter what reasons are given for the telephone calls between the prosecuting officer and the presiding judge, it does not absolve the State of its responsibility to see that [Defendant] Younger receives the due process afforded to him by law. The absolute appearance of impropriety in these telephone calls is such that the State cannot in good faith subject [Defendant] Younger to further criminal prosecution in this matter. There is no remedy in the law that will remove the taint that has been placed on this case as a result of these telephone calls. Any verdict, for or against conviction, would be viewed with suspicion.

A list of dates, times, and durations of the supposed phone calls between numbers associated with Detective Brumley and Judge Reedy was attached as an appendix to the Motion to Nolle. A hearing on the Motion to Nolle was held on December 17, 2010. By this time, Judge Reedy had recused herself in Defendant Younger's case, and the Honorable Jon Kerry Blackwood, Senior Judge, was appointed to preside over the hearing. At the hearing, the parties discussed the numerous phone calls alleged to have been made between Detective Brumley and Judge Reedy, as well as purported *Brady* violations involving Anita Wilson. Judge Blackwood, in dismissing the indictment without prejudice, recounted the procedural history in Defendant Younger's case, focusing primarily on the State's "drug dealer" question, which led Judge Reedy to order a mistrial. Judge Blackwood stated:

> But it's the Court's findings that the motion to dismiss, or the [Motion to Nolle] should be without prejudice . . . I don't intend to suggest anything except my interpretation from reading a cold record, and listening to the arguments of counsel. I don't intend that to be taken as any comment about anything that's happened in this case favorably or unfavorably or . . . however you may take it . . . or to comment about the propriety of any actions that have been taken in the case. This is a decision based upon what I believe to be the law . . . in the state of Tennessee.

Following the trial court's granting of the Motion to Nolle, the State and Defendant Younger filed a joint Motion to Dismiss his interlocutory appeal, which this court granted on December 21, 2010.

13

*[] Petitioner's direct appeal*

[] Petitioner filed his notice of appeal in May 2010, and this court issued its opinion in [] Petitioner's case on August 16, 2011; thus, the proceedings in Defendant Younger's case described above all occurred while [] Petitioner's case was pending on direct appeal. In December 2010, trial counsel attempted to raise the issue of the State's dismissal of Defendant Younger's case by filing a Motion to Consider Post–Judgment Facts in this court, but the court denied the motion, stating:

> The [Petitioner], through counsel, has filed a motion to consider as post-judgment facts the "admissions" of the District Attorney General made in a motion to enter a *nolle prosequi* filed in *State [ ] v. Michael Younger,* Bradley County Criminal Court case number 08–457, a co-defendant's case. The motion filed by the prosecutor in the *Younger* case calls into question the credibility of Duff Brumley, the State's prosecuting witness in both the *Younger* case and the [Petitioner's] case. The State argues in opposition to the motion that the assertions made by the prosecutor in the *Younger* motion do not constitute post-judgment "facts" capable of consideration by this court pursuant to Rule 14 of the Rules of Appellate Procedure. The State's position is well-taken. *See* Tenn. R. App. P. 14, Advisory Comm'n Comments (stating that rule permits consideration of only those post-judgment facts "unrelated to the merits and not genuinely disputed" in order to "keep the record up to date" and "is not intended to permit a retrial in the appellate court"); *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988) ("Allegations contained in pleadings are not evidence."). Accordingly, the [Petitioner's] motion is denied.

*Johnson v. State*, No. E2017-00037-CCA-R3-PC, 2018 WL 784761, at *7–10 (Tenn. Crim. App. Feb. 8, 2018), *perm. app. denied* (Tenn. June 6, 2018) ("*Johnson II*") (footnote and citation omitted).

After the TCCA affirmed his convictions on direct appeal, Petitioner filed a lengthy *pro se* petition for post-conviction relief (Doc. 9-19, at 6–51), a *pro se* amendment to that petition (Doc. 9-30, at 54–151; Doc. 9-31, at 2), and, through counsel, an addendum (Doc. 9-31, at 62–67). After a hearing on the petition (Docs. 9-39–48), the post-judgment court denied Petitioner relief in a detailed and thorough opinion (Doc. 9-37, at 80–93; Doc. 9-38, at 2–56). In doing so,

14

the court noted that while Petitioner had raised a number of claims in his filings, the proof presented at the hearing and in Petitioner's post-hearing briefs was limited to approximately eight claims (Doc. 9-37, at 85). The court therefore denied Petitioner post-conviction relief for the claims he had raised but presented no proof of support for (*Id.*) before denying Petitioner relief on the remainder of his claims on their merits (*Id.* at 85–93; Doc. 9-38, at 2–56). Petitioner appealed, and the TCCA set forth the following summary of the proof presented at the post-conviction hearing in its opinion affirming the denial of post-conviction relief:

> At an evidentiary hearing conducted in March 2016, [] Petitioner called two witnesses. Michael J. Cohan testified that he was a private investigator with thirty-one years' experience and that he was hired by trial counsel as an investigator in [] Petitioner's case, after trial counsel's initial request for funding was approved by the Administrative Office of the Courts (AOC) on February 23, 2007. He recalled that the case was a "seven-year[-]old murder" and that the State filed a death notice. Mr. Cohan testified that he met with [] Petitioner to discuss the case in both June and July of 2007. Although Mr. Cohan had not yet received a copy of discovery, he had a copy of the lengthy Task Force Report produced by investigators and an affidavit for a search warrant relating to the case. Mr. Cohan took "the two of those and pulled witnesses and witness information from [the documents]." Mr. Cohan spoke to the investigator for Defendant Younger in July 2007 and learned that counsel and the investigator for Defendant Younger had met with Detective Duff Brumley, the lead detective on the case, for three hours and that they had "boxes of discovery." Mr. Cohan sent an email on July 19, 2007, to trial counsel about the three-hour meeting Defendant Younger's counsel had with Detective Brumley and asked trial counsel if it was possible for them to set up a meeting with the detective.
>
> Based on trial counsel's instructions, Mr. Cohan met with Lois Patterson and interviewed her. Ms. Patterson stated that [] Petitioner had been staying at her house at the time of the murders, but she did not provide [] Petitioner with an "absolute alibi." Mr. Cohan took two trips in July 2007 to meet with [] Petitioner and discuss the case. In an email sent to trial counsel in August 2007, Mr. Cohan again "nagged" trial counsel about discovery. He received a response from trial counsel which stated, "I have been nagging my secretary about the same things. I will double my efforts." On September 13, 2007, Mr. Cohan sent another email to trial counsel stating, "I am not in a hurry, got plenty to do, we are on hold until we can get discovery and talk to the cop."

Mr. Cohan testified that he had no further contact from trial counsel in October, so he sent another email on November 5, 2007, stating:

> Just checking in so you don't think I am dodging you. We are stuck until we get the rest of discovery and talk with the cop. If . . . that is unacceptable, I need guidance. We got no mitigation. I suspect that you have a deal in the works, but I am just checking in.

Following this email, Mr. Cohan did not have any contact with trial counsel from January 2008 through June 2008, nor did he receive a copy of discovery. In July 2008, Mr. Cohan emailed trial counsel asking if trial counsel would sign a certificate for a bill that he had submitted to trial counsel previously, but trial counsel did not respond until December 2008.

Mr. Cohan testified that he received a copy of discovery on February 10, 2009. He explained that the discovery, which was contained in multiple banker's boxes, was voluminous and "[o]verwhelming." Mr. Cohan began the lengthy process of organizing and summarizing the information contained in discovery. Upon review, he identified 112 potential witnesses and noted that the discovery contained multiple statements from witnesses, all of whom he needed to interview if possible. Mr. Cohan explained that the "idea is to know what they are going to say, not just what the statement says, in case those things are not necessarily the same, or in case they say something else that is not in the statement." In April 2009, Mr. Cohan emailed trial counsel and informed him that the authorization for funding was almost depleted, as there was only $115 left of the authorization. On April 28, 2009, Mr. Cohan provided trial counsel with an affidavit and order for additional funding and asked trial counsel to get it signed. However, he did not receive a response from trial counsel. On July 7, 2009, Mr. Cohan received an email from co-counsel, who sat second chair on [] Petitioner's case, requesting that Mr. Cohan talk to a witness. Mr. Cohan told co-counsel that he was "on hold" because they had been "out of money for some time now." He did not receive a response from co-counsel.

Mr. Cohan recalled that he received a telephone call from trial counsel's secretary on July 23, 2009. The secretary said that trial counsel needed a new copy of the order and affidavit that Mr. Cohan had previously provided him. The secretary also told Mr. Cohan that [] Petitioner's case was "going to trial in August." That evening, Mr. Cohan faxed trial counsel a letter, stating that he was withdrawing from the case because there was "no way we could conduct this investigation in 24 days." Mr. Cohan stated, "You can't go find 150 people in 24 days, I mean, they are not standing on the street corner waiting on you." Mr. Cohan testified that he never met with Detective Brumley.

As part of discovery, Mr. Cohan learned that a federal inmate, Antwon Cook, had made a statement to Detective Brumley and an Assistant United States Attorney

that implicated Kerry Rogers in the murders. Mr. Cook advised that Mr. Rogers told him that "the Valentine's Day triple homicide was 'some of his work.'" Mr. Cohan also learned from a "lead sheet" contained in discovery that Stacy Clabough made multiple statements to investigators. In one statement dated October 11, 2005, Ms. Clabough admitted that she had been in the victims' residence around 3:00 a.m. on the day of the murders. She said that she spoke momentarily to OJ Blair and Twanna Blair and then left the residence. Ms. Clabough also disclosed that she "[h]eard it was Kerry Rogers."

Mr. Cohan explained that the Task Force Report contained a statement from another federal inmate, Jerome Hadley, implicating Mr. Rogers. According to Mr. Hadley, Mr. Rogers told him, "I was there, I know what happened but I'm not going to talk to the police about that." Mr. Cohan testified that discovery also contained investigators' notes about an interview with federal inmate, Charlie Stephenson, who said that he sold two guns to Mr. Rogers and that those guns were used in the victims' murders. Mr. Stephenson said that Mr. Rogers drove a "white Corvette with flip up headlights" at the time. Also in discovery was an investigative lead report regarding a man named John Thomas, who stated that OJ Blair "got his drugs from Kerry Rogers[.]" Mr. Cohan testified that trial counsel gave him no instructions in regards to these witnesses. He stated that, had he been given instruction and appropriate funding, he would have attempted to find these witnesses.

Mr. Cohan also testified about witnesses identified in a TBI report. He explained that, in a sworn statement, Jennifer Folliett told investigators that she had received a letter, which contained a photograph of victim Dawn Rogers, which stated, "You are next n***** lover to kill a whore." Mr. Cohan stated that trial counsel did not instruct him to interview Ms. Folliet about who may have sent the letter. The TBI report also contained a lengthy statement from William Neely, who implicated Ronnie Cox, Corey Davis, and Jeff Roarke in the homicides. Mr. Neely said that both Mr. Cox and Mr. Davis admitted to him that they murdered the victims and that he saw blood on their clothing. He explained that the victims were murdered because OJ Blair was "messing around with [Mr. Roarke's] girlfriend." In additional investigative lead sheets, Mr. Cohan discovered that Faye Lindsey and Kenyatta Waters told investigators that the murders were connected to a fight the night before between "the Roarkes," OJ Blair, and Twanna Blair. A man named Larry Hardy also spoke to investigators and implicated Corey Davis. Jill Flowers told investigators that, following the murders, Twanna Blair told her that "three white men dressed in police uniforms" committed the murders. Trial counsel provided Mr. Cohan no instruction in regards to these witnesses.

Mr. Cohan recalled that there were two sworn statements in discovery from Vanessa Latham. In the first sworn statement, given on November 23, 2005, Ms. Latham told investigators that [] Petitioner had never spoken to her about the murders; she stated that [] Petitioner was "not the type of person to kill someone

17

himself, I don't think. I think he could have someone do it for him." However, Ms. Latham provided a second sworn statement six days later, in which she said that [] Petitioner confessed to her that he committed the murders.

Additionally, police reports contained in discovery indicated that Stacy Clabough had given four statements to various investigators with the Cleveland Police Department. In the first statement, provided February 17, 1999, Ms. Clabough said that she was at the Sweetwater party the night before the murders and that [] Petitioner "kept talking about getting a gun." She also said that she was at the victims' apartment for about five minutes around 3:30 a.m. on February 14 and that she saw OJ Blair and Twanna Blair at the residence. Ms. Clabough stated that she had heard that John Garrett, victim Dawn Roger's ex-husband, "might have had something to do with the killings[.]" In a second statement dated March 22, 2000, Ms. Clabough again stated that she went to the victims' apartment around 3:00 a.m. on February 14; she said that she spoke to Twanna Blair briefly and saw OJ Blair sitting on the couch. Ms. Clabough was interviewed again on October 11, 2005, and she initially stated that there was no answer at the door to the victims' apartment when she knocked on the door at 3:00 a.m. However, Ms. Clabough then acknowledged entering the residence and speaking to both OJ and Twanna Blair "momentarily." Ms. Clabough recalled seeing a white sports car, a red car, and a black truck in the parking lot of the victims' apartment building. She stated that OJ Blair sold drugs and that "[e]verybody sa[id] he got killed because of it." Finally, Ms. Clabough provided a sworn statement to Detective Brumley on January 22, 2008, when she was incarcerated in the Bradley County Jail on a probation violation. She admitted that she had withheld information in her previous interviews "out of fear[.]" Ms. Clabough stated that, when she arrived at the victims' residence around 3:15 a.m. on February 14, Twanna Blair answered the door, "said they were asleep and closed the door." Ms. Clabough said that the door was "only cracked" open, and "it was hard to see." She explained that, as she walked back to her car, she saw a black male sitting in the driver's seat of a red car wearing a dark colored stocking cap or toboggan. She described the man as "tall and thin."

Mr. Cohan agreed that he could not say whether any of these potential witnesses could have been located and that he had no idea what they would have said if he had talked to them. However, he stated that it was important to act quickly in an investigation because it increased the likelihood that witnesses would be living in the same place and could, thus, be located by the investigator and because the sooner they could be located, "the better the [witnesses'] memories [were.]" Mr. Cohan explained that he needed to review discovery before talking to witnesses because "99 percent of the time[,] after we talk to them, they are not going to talk to us again."

Trial counsel testified that he had practiced law since 1988 and that he and the District Public Defender were appointed to represent [] Petitioner in early 2007. Trial counsel recalled that [] Petitioner was charged with first degree murder,

along with two co-defendants, and the State had filed a notice to seek the death penalty in [] Petitioner's case. After his appointment, trial counsel began to familiarize himself with the case; he spoke to [] Petitioner and to witness Lois Patterson. He also discussed the case with the State and with the Public Defender. Trial counsel explained that he let the Public Defender get discovery because his office was in Cleveland and trial counsel's office was not. Trial counsel stated, however, that the Public Defender provided him a copy of discovery, and he went to the Cleveland Police Department to "review some things" on several occasions. Trial counsel estimated that he worked hundreds of hours on [] Petitioner's case. He recalled that the State's case was circumstantial, with no forensic evidence connecting [] Petitioner to the crime. Trial counsel acknowledged that he was never able to "firm up" Ms. Patterson as an alibi witness. Trial counsel testified that the Public Defender eventually discovered a conflict, and the trial court appointed co-counsel as second chair.

[] Petitioner went to trial in August 2009. Trial counsel explained that because the homicides occurred in 1999 and the investigation continued over eight years, there was "a lot" of discovery, and it was provided to trial counsel "in waves." He stated that he had some of discovery by March 3, 2008, which included information about federal wiretaps conducted on [] Petitioner. Trial counsel recalled that funding for an investigator was approved on February 23, 2007, and he hired Mr. Cohan. Trial counsel agreed that his records showed that he corresponded with Mr. Cohan for a total of 5.1 hours before trial. He acknowledged that Mr. Cohan did not interview any witnesses other than Ms. Patterson. Trial counsel stated that he also interviewed Ms. Patterson, who provided trial counsel with contact information for "a lot of the witnesses" and helped in "getting some of the witnesses . . . to [trial counsel's] office." Trial counsel agreed that he billed the AOC for a total of 4.6 hours for talking to witnesses and 5.9 hours for speaking with [] Petitioner.

He stated that he discussed with [] Petitioner, both before and during trial, whether [] Petitioner would testify, and [] Petitioner decided to testify. Trial counsel recalled that, in preparation for [] Petitioner's testimony, he talked to [] Petitioner about the events at the party in Sweetwater. They also discussed [] Petitioner's relationship with several of the women who were set to testify for the State. Trial counsel discussed [] Petitioner's criminal history and how they would approach it if [] Petitioner testified. Trial counsel agreed that he did not practice specific questions with [] Petitioner to prepare his testimony. However, trial counsel stated that he knew [] Petitioner would say that he was not sure where he was when the murders took place because "it was eight years later." Trial counsel explained:

> [T]here was always some question about where he was, because even when we were looking at the possibility of an alibi, there w[ere] some things that we couldn't firm up dates.
> . . .

19

I mean, and remember, we are trying to piece all this together seven years later or eight years later.

. . .

Well, it is unhelpful for him to lie and say he is somewhere that can later be proved he wasn't there. And plus, we were in a situation where three or four women had said that [[] Petitioner] had felt the need to unburden himself to them. And, you know, it is easy to potentially call one woman a liar, but it is a whole lot harder to call four women a liar. And so at that point, basically, if [[] Petitioner] sits over there in stone silence, then that's going to confirm in a lot of people's mind that, well, then, they must be telling the truth and he must be lying.

\*       \*       \*

Trial counsel stated that, as part of trial strategy, they decided to have [] Petitioner testify and admit that he was a convicted drug dealer. Trial counsel testified that his strategy was to be forthright with the jury regarding [] Petitioner's drug dealing while advancing the theory that [] Petitioner was "not the type of person who would kill someone." As such, trial counsel did not object to testimony regarding a conversation between a State witness and [] Petitioner that took place while [] Petitioner was incarcerated in federal prison.

Trial counsel testified that he called Twanna Blair—who was charged with the murders and with aggravated perjury—as a witness at trial for the sole purpose of authenticating her voice on the 911 recording. He explained that her attorney objected repeatedly to her testifying, and at some point, Defendant Blair invoked her Fifth Amendment rights. When asked why he did not question Defendant Blair about her earlier statement to police in which she said it was "three white guys [who] did it," trial counsel replied, "I don't remember how the decision was made with regard to that." He stated that he did not recall seeing a document in discovery which showed that Defendant Blair's hands tested positive for gunshot residue. Trial counsel agreed that, had he known this information, he would have wanted to present it to the jury.

Trial counsel stated that the theory of defense was that unknown individuals shot the victims, that [] Petitioner was never at the victims' apartment in Cleveland, and that the Sweetwater party did not provide motive for the murders. He agreed that five people interviewed by police implicated Kerry Rogers in the killings and four people implicated Jeff Roarke, Corey Davis, and Ronnie Cox. He agreed that Mr. Cook and Mr. Hadley were potential witnesses that he would have wanted to talk to about Mr. Rogers' involvement in the crime. When shown the letter received by Ms. Folliett threatening Dawn Rogers, trial counsel stated that he did not recognize the letter but that he would have wanted to talk to Ms.

Folliett about the letter prior to trial. Trial counsel acknowledged that Mr. Neely, who had seen a pistol burn on Mr. Cox's body, was not interviewed about his statements to police. He stated that none of these potential witnesses testified at trial.

Trial counsel explained that the State's theory was that there had been a fight between [] Petitioner and OJ Blair the night before the murders while they were at a party in Sweetwater and that [] Petitioner had taken revenge against OJ Blair for the fight. Trial counsel acknowledged that Ms. Lindsey told police that OJ Blair and Twanna Blair had been in a fight with "the Roarkes" at the Sweetwater party, which would "indicate that there were other people out there with the exact same motive." Additionally, Ms. Waters' statement to police appeared to corroborate that there had been a fight between "the Roarkes" and OJ Blair.

Trial counsel testified that trial witness Vanessa Latham gave at least two statements to investigators. He recalled that Ms. Latham testified consistently with her second statement, *i.e.,* she said that [] Petitioner admitted to her that he killed the victims. However, Ms. Latham made a statement six days prior to trial, in which she said that [] Petitioner was not the type of person to kill someone but that she thought "he could have somebody do it for him." Trial counsel could not recall if Ms. Latham was confronted with the first statement on cross-examination at trial. Trial counsel testified that Ms. Latham participated in two recorded phone calls with [] Petitioner as part of the police investigation and that [] Petitioner made comments during these calls "that could be interpreted in a damaging way."

Regarding witness Stacy Clabough, trial counsel recalled that she testified at trial that she saw a man fitting [] Petitioner's description in a car outside the victims' apartment the morning of the murders but that her first three statements to police did not mention this. Additionally, Ms. Clabough's third statement to police implicated Kerry Rogers. Trial counsel acknowledged that Ms. Clabough was not confronted with these prior statements, explaining that he purposely did not ask her about these prior statements because of trial counsel's previous hearsay objections against the State.

Trial counsel testified that he could not recall why he did not raise [the] issue of prosecutorial misconduct in the motion for new trial and agreed that his failure to do so caused the issue to be waived on appeal. Prior to the conclusion of the direct appeal, the State entered the Motion to Nolle in Defendant Younger's case "due to the fact that Detective Brumley was under investigation at that time for some actions that had resulted in him losing his job." In response, trial counsel filed a Motion to Consider Post–Judgment Facts with the appellate court. In the motion, trial counsel alleged that the State believed that Anita Wilson, who testified against [] Petitioner, was held on a fugitive from justice warrant that did not exist and that her testimony was coerced. The motion was unsuccessful, and trial counsel did not raise the Brumley issue either as plain error or by filing a

petition for writ of error coram nobis on behalf of [] Petitioner. He explained that he considered the possibility of filing for coram nobis relief, but he "didn't believe that that was going to be enough to where the [c]ourt was going to say that . . . [[] Petitioner] was prejudiced to the extent" required for coram nobis relief.

Trial counsel agreed that, at trial, the State suggested that it would not mention that [] Petitioner had been in federal prison, but trial counsel said that it was okay to mention it because "[g]iven the approach that we were leaning toward, as far as [[] Petitioner] being open and aboveboard about his history, about what he had done, about where he had been, that we did not see that that was something that would be damaging." He explained that the trial strategy was to portray [] Petitioner as "a drug dealer but not a killer." Trial counsel acknowledged, however, that he could have asked about whether a trial witness was expecting a reduction in his federal sentence without allowing the jury to hear that [] Petitioner had been in federal prison.

Trial counsel had no explanation as to why there was a two-year period during which [] Petitioner's investigator did nothing on the case. He recalled that, when [] Petitioner's case was set for trial in August 2009, he filed a Motion for Continuance, but the motion was denied. Trial counsel agreed that the jury never had an opportunity to consider Kerry Rogers or Jeff Roarke as alternative suspects. However, trial counsel stated that he was not aware of any exception to the hearsay rule that would have allowed hearsay statements about other suspects into evidence.

The State called co-counsel to testify. Co-counsel stated that he was appointed as second chair on [] Petitioner's case in the spring of 2009. Co-counsel met with the Public Defender and retrieved his file on [] Petitioner's case. Co-counsel then organized the file, discussed with trial counsel the State's case and general trial strategy, and sent out jury questionnaires. He testified that he spent a lot of time organizing the Public Defender's file because when he received it, the file was "just thrown into more and more boxes." Co-counsel recalled that the evidence against [] Petitioner was circumstantial. Although the State presented witness statements implicating [] Petitioner, it presented no forensic or physical evidence. Regarding witness statements implicating [] Petitioner, co-counsel stated:

> And in my assessment, the number of those statements was somewhat troubling, you know, given the fact that maybe you could discredit one person or two persons. But if you had five or six, it makes it much more difficult. That was what I thought was the strong point[ ] of the State's case.

Co-counsel believed, however, that there were other persons with the "motive and opportunity" to commit the offenses.

Co-counsel recalled that he sent an email to Mr. Cohan, asking that Mr. Cohan interview a witness. However, Mr. Cohan told him that they were "out of money."

Co-counsel testified that he would have expected Mr. Cohan to attempt to interview witnesses, and he agreed that it was trial counsel's role to direct the investigator and follow up with him. Co-counsel recalled that he and trial counsel spoke to [] Petitioner about whether or not to testify "at different times in the trial[.]" Co-counsel stated that, as part of trial strategy, they did not try to hide the fact that [] Petitioner had a federal drug conviction and "was known as the guy that kind of ran the drug trade in the Sweetwater area." He explained:

> . . . I would assume one of the reasons a lot of times you would not want a defendant to testify is because they have a serious criminal record that you are trying to keep out in front of a jury, but I know in this case that I think we were upfront maybe in opening argument even that [[] Petitioner] had a criminal record, he was serving time for a federal drug conviction. We didn't try to hide any of that fact, that he was somewhat known as maybe the—I don't want to use the word, drug kingpin, because that's not what we said. But maybe he was known as the guy that kind of ran the drug trade in the Sweetwater area. And we let the jury know that up front.
>
> And I think we did discuss with him at different times testifying in that, you know, obviously, if he testified, he was going to be subjected to cross-examination and was going to have to answer some things and explain some things and would be on display, so to speak, for the jury, so—but I am sure we did discuss that with him.

Co-counsel stated that he was no longer on the case at the time the post-trial motions were filed. He recalled, however, that the District Attorney General was "adamant" that [] Petitioner's counsel needed to file something against the trial judge. Co-counsel stated, "But I did not feel that Judge Reedy treated us at all unfairly in this trial . . . . She was much harder on the District Attorney General's Office than on us."

*Johnson II*, at *11–16. With regard to the issue of the phone calls between Detective Brumley and Judge Reedy, the TCCA noted that, in Michael Younger's case, the prosecution acknowledged seventy-eight such calls occurred between October 6, 2008, the date of Petitioner's indictment (Doc. 9-2, at 5), and August of 2009, when Petitioner's trial started, but

no such phone calls occurred during Petitioner's trial. *Id.* at *9 n. 5. The TCCA affirmed the denial of the post-conviction petition. *Id.* at *30.

Petitioner next filed his pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1), which is now before the Court, in which he asserts the following claims for relief:

1. The evidence is insufficient to sustain his convictions (Doc. 1, at 4; Doc. 2, at 56–61; Doc. 16, at 13–18);

2. Counsel was ineffective for (1) failing to fully investigate the case and interview all witnesses about Detective Brumley threatening or intimidating them into making materially false statements and (2) failing to investigate Detective Brumley's disciplinary history (Doc. 1, at 5; Doc. 2, at 61–66; Doc. 16, at 20–23);

3. Counsel was ineffective for failing to object to the playing of a recorded phone call between Petitioner and BJ Colquitt (Doc. 1, at 6; Doc. 2, at 67–72; Doc. 16, at 23–24);

4. Counsel was ineffective for failing to object to and request a mistrial based upon the prosecution calling numerous witnesses as a mere ruse to introduce improper and prejudicial evidence and failing to raise this issue as plain error in the motion for new trial and direct appeal (Doc. 1, at 7-8; Doc. 2, at 73–79; Doc. 16, at 24–25);

5. Counsel was ineffective for failing to cross-examine or otherwise question Twanna Blair about her pretrial statements (Doc. 1, at 14; Doc. 2, at 79–88; Doc. 16, at 25–26);

6. Counsel was ineffective for failing to interview, subpoena, and/or otherwise utilize various individuals as witnesses (Doc. 1, at 14–15; Doc. 2, at 88–93; Doc. 16, at 26–28);

7. Counsel was ineffective for informing the jury that Petitioner was incarcerated (Doc. 1, at 15; Doc. 2, at 94–97; Doc. 16, at 28);

8. Counsel was ineffective for introducing evidence of:

   a. Petitioner's prior womanizing;
   b. Drug-related activity;
   c. The fight between Petitioner and OJ Blair;
   d. The breaking of the door off the hinge at Amy Lonas's residence; and
   e. Other bad conduct of Petitioner.

   (Doc. 1, at 15; Doc. 2, at 97–110; Doc. 16, at 29–30);

24

9.  Counsel had a conflict of interest because he had previously sought to prosecute Petitioner and previously represented Judge Reedy (Doc. 1, at 15–16; Doc. 2, at 110–14; Doc. 16, at 30);

10. Counsel was ineffective for failing to fully investigate the case and failing to raise the defense of third-party guilt (Doc. 1, at 16; Doc. 2, at 115–19; Doc. 16, at 31);

11. Counsel failed to object and/or request a mistrial due to the prosecutor's numerous instances of prejudicial and improper comments and conduct and failed to raise these issues as plain error in the motion for new trial and direct appeal (Doc. 1, at 16; Doc. 2, at 119–27; Doc. 16, at 32);

12. Counsel was ineffective for failing to file a petition for writ of error coram nobis and failing to move to stay Petitioner's direct appeal due to Detective Brumley's wrongdoing and arguments for Judge Reedy's recusal (Doc. 1, at 16–17; Doc. 2, at 127–34; Doc. 16, at 33);

13. Counsel was ineffective for failing to thoroughly investigate the case by communicating with Michael Cohan and/or timely seeking funding for investigation of the case (Doc. 1, at 17; Doc. 2, at 134–39; Doc. 16, at 34);

14. Counsel was ineffective in a manner that results in a presumption of prejudice under *United States v. Cronic*, 466 U.S. 648 (1984) because his failure to engage and obtain additional funding for the investigator meant that he was not functioning in an adversarial capacity (Doc. 1, at 17; Doc. 2, at 139–41; Doc. 16, at 35–36);

15. Counsel failed to object, request a mistrial, and raise as plain error in the motion for new trial and on direct appeal the prosecutor's argument and proof that constructively amended the indictment, and failed to argue to the jury that the proof did not meet the requirements for conviction (Doc. 1, at 17–18; Doc. 2, at 141–46; Doc. 16, at 36–37);

16. Counsel failed to object, request a mistrial, and raise as plain error in the motion for new trial and on direct appeal the fatal variance between the indictment and the proof presented at trial (Doc. 1, at 18; Doc. 2, at 146–54; Doc. 16, at 37–38);

17. Counsel was ineffective for failing to move to dismiss the indictment and/or seek disqualification of the Bradley County District Attorney's Office (Doc. 1, at 18; Doc. 2, at 154–59; Doc. 16, at 38–40);

18. Counsel failed to move to dismiss Counts 4 and 5 of the indictment and/or challenge these counts on the basis that the indictment was insufficient, duplicitous, and/or violated the principles of double jeopardy and/or that the prosecution relied on an improper factual predicate of a robbery against OJ Blair, as neither female victim's property was specified as the subject of a robbery (Doc. 1, at 18–19; Doc. 2, at 159–68; Doc. 16, at 40–41);

25

19. The prosecution suppressed records in possession of the Cleveland Police Department of Detective Brumley's disciplinary history and other evidence that would have called Detective Brumley's credibility into question (Doc. 1, at 19; Doc. 2, at 171–73; Doc. 16, at 44–49);

20. The prosecution suppressed evidence relating to third-party guilt (Doc. 1, at. 20; Doc. 2, at 174–76; Doc. 16, at. 49–50);

21. The prosecution suppressed evidence of Twanna Blair's positive gunpowder residue test (Doc. 1, at 20; Doc. 2, at 176; Doc. 16, at 50–51);

22. The prosecution suppressed evidence of Antwon Cook's statements implicating Kerry Rogers as the murderer (Doc. 1, at 20; Doc. 2, at 177; Doc. 16, at 51–52);

23. The prosecution suppressed evidence that police found a .22 rifle and ammunition on or near Kerry Rogers during a 2006 search (Doc. 1, at 20–21; Doc. 2, at 178–79; Doc. 16, at 52–57); and

24. The relationship/communications between Judge Reedy and Detective Brumley caused structural error in his trial that violated his due process rights (Doc. 1, at 21; Doc. 2, at 179–84; Doc. 16, at 57–58).

In support of his petition, Petitioner filed a one-hundred and eighty-five-page memorandum (Doc. 2) and an exhibit (Doc. 2-1). Respondent filed a response in opposition thereto (Doc. 10), as well as the state record (Doc. 9). Petitioner filed a reply (Doc. 16).

## II.     STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified in 28 U.S.C. § 2254, *et. seq.*, a district court may not grant habeas corpus relief for a claim that a state court decided on the merits unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

26

28 U.S.C. § 2254(d)(1)–(2).  This standard is hard to satisfy.  *Montgomery v. Bobby*, 654 F.3d

668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully

demanding standard . . . 'because it was meant to be'") (quoting *Harrington v. Richter*, 131 S.

Ct. 770, 786 (2011)).  When evaluating the evidence presented in State court, a federal habeas

court presumes the correctness of the State court's factual findings unless the petitioner rebuts

that presumption with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

## III.    ANALYSIS

### A.  Exhaustion

Before a federal court may grant habeas relief to a state prisoner, the prisoner must

exhaust his available state-court remedies.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526

U.S. 838, 842 (1999).  Exhaustion requires the petitioner to "fairly present" each federal claim to

all levels of the state appellate system by presenting the "same claim under the same theory" up

to the state's highest court, *Wagner v. Smith*, 581 F.3d 410, 414, 418 (6th Cir. 2009), to ensure

that states have a "full and fair opportunity to rule on the petitioner's claims."  *Manning v.

Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  When a petitioner no longer "has the right under

the law" to properly exhaust a claim with the state courts, the claim is technically exhausted but

procedurally defaulted.  *See* 28 U.S.C. § 2254(c); *Atkins v. Holloway*, 792 F.3d 654, 657 (6th

Cir. 2015) (providing that "when a petitioner fails to present a claim in state court, but that

remedy is no longer available to him, the claim is technically exhausted, yet procedurally

defaulted"); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-

102(c) ("one petition" rule).

"Federal courts lack jurisdiction to consider a habeas petition claim that was not fairly

presented to the state courts."  *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004) (citing

*Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)).  Thus, a prisoner's procedural default of a claim forecloses federal habeas review unless the petitioner shows cause to excuse his failure to comply with the procedural rule and actual prejudice from the constitutional violation.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Petitioner presented the following claims to the TCCA on his direct appeal of his convictions: (1) the evidence was insufficient to support his conviction for especially aggravated robbery, and thus all of his convictions, including his felony-murder convictions, should be "thrown out" (Doc. 9-13, at 17–19); (2) the prosecution's improper actions at trial unfairly prejudiced the jury (*Id.* at 20–22); and (3) the discovery of wrongdoing by an officer in the case tainted the evidence (*Id.* at 23–24).  Petitioner presented the following claims to the TCCA in his appeal of the denial of his petition for post-conviction relief:  (1) trial counsel was inadequate because he failed to adequately interview witnesses (Doc. 9-49, at 46–61); (2) trial counsel failed to adequately prepare Petitioner to testify (*Id.* at 61–63); (3) trial counsel failed to object to irrelevant evidence regarding the Sweetwater fight and Petitioner's drug dealing (*Id.* at 63–65); (4) trial counsel failed to ask Twanna Blair about her statement that three white men were responsible for the shootings (*Id.* at 65–67); (5) counsel failed to protect Petitioner's appellate rights by raising Detective Brumley's wrongdoing as (a) plain error and/or (b) as a writ of error coram nobis (*Id.* at 67–70); (6) the cumulative effect of trial counsel's errors denied him a fair trial (*Id.* at 70–72) and (7) the issues raised in the prosecution's motion to nolle prosequi the charges against Michael Younger establish a structural error in his trial that denied him an impartial judge (*Id.* at 72–77).

Petitioner acknowledges that he did not exhaust all of his claims for § 2254 relief with the TCCA but argues that the Court should excuse this under various theories (Doc. 2, at 6–10).

28

First, Petitioner asserts that any procedural default was due to the ineffective assistance of his appellate and/or post-conviction counsel (*Id.* at 6–7). Second, Petitioner argues that Tennessee Supreme Court Rule 13, which does not provide a non-capital defendant seeking post-conviction relief the opportunity to acquire funds for an investigator, excuses his default of claims (*Id.* at 7–9). Third, Petitioner states that Tennessee's one-petition rule prevents review of later-arising claims for actual innocence and/or prosecutorial suppression of evidence and excuses his procedural default of those claims (*Id.* at 9). Lastly, Petitioner asserts that newly discovered evidence of his actual innocence establishes that failure to consider his claims would result in a miscarriage of justice and entitles him to review of his procedurally defaulted claims (*see, e.g., id.* at 9–10).

Accordingly, the Court will first analyze the merits of each of Petitioner's arguments to excuse of his procedural default of claims before addressing each claim.

### 1. The *Martinez* Exception

Petitioner first asserts that his procedural default of any claims was due to the ineffective assistance of his appellate and/or post-conviction counsel. However, as set forth above, the only claim for ineffective assistance of appellate counsel that Petitioner exhausted with the TCCA was that counsel should have protected his appellate rights regarding allegations of wrongdoing by Detective Brumley and/or Judge Reedy. Thus, he procedurally defaulted all other claims for ineffective assistance of appellate counsel.

Moreover, petitioners do not have a constitutional right to effective assistance of post-conviction counsel. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). As such, ineffective assistance of counsel in post-conviction proceedings generally does not establish "cause" to excuse procedural default. *Coleman*, 501 U.S. at 755.

But, when a petitioner could raise a claim for trial counsel's ineffective assistance for the first time in a post-conviction petition, ineffective assistance of post-conviction counsel may be "cause" to excuse procedural default of a substantial ineffective assistance of counsel claim. *Trevino v. Thaler*, 133 S.Ct. 1911, 1918–21 (2013); *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012); *Wallace v. Sexton*, 570 F. App'x 443, 452–53 (6th Cir. 2014). This exception, referred to as the *Martinez* exception, applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014).

However, *Martinez* only allows a petitioner to present claims for ineffective assistance of trial counsel that he defaulted due to the ineffective assistance of post-conviction counsel—it does not excuse a petitioner's default of other types of claims. *See Abdur'Rahman v. Carpenter*, 805 F.3d 710, 714 (6th Cir. 2015). Moreover, the Supreme Court has declined to extend the *Martinez* exception to excuse a habeas petitioner's procedural default of an ineffective assistance of appellate counsel claim. *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017) (declining to extend the scope of *Martinez* to include procedurally defaulted claims of ineffective assistance of direct appellate counsel due to ineffectiveness of post-conviction counsel). Further, the *Martinez* exception does not apply to ineffective assistance of counsel claims that the petitioner defaulted in his appeal after the post-conviction court rejected them on the merits.[1] *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1136 (6th Cir. 2016) (stating that *Martinez* did not apply because the "claims were raised and rejected on the merits by the initial postconviction court, and ineffective

---

[1] The post-conviction court specifically held that a number of arguments that Petitioner raised in his "various petitions for relief [we]re denied, as [] [P]etitioner [] failed to present clear and convincing evidence to support these factual assertions." (Doc. 9-37, at 83). When a state court denies relief on a properly presented federal claim, federal courts presume that the state court adjudicated that claim on the merits. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Petitioner has set forth no evidence or argument to dispute that presumption as to this holding.

30

assistance of counsel on post-conviction appeal cannot establish 'cause' to excuse [petitioner]'s procedural default, which occurred only in the Tennessee Court of Criminal Appeals").

Thus, the Court may only address Petitioner's unexhausted claims for ineffective assistance of trial counsel that he did not bring in his original petition for post-conviction relief under the *Martinez* exception. The Court will address those claims below.

### 2. Actual Innocence

Petitioner also argues that the Court should excuse his procedural default of claims due to his actual innocence. A claim that has been procedurally defaulted may be considered on its merits if the petitioner demonstrates that his is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); s*ee also House v. Bell*, 547 U.S. 518, 536 (2006). To obtain review under this doctrine, which is reserved for fundamental miscarriages of justice, the petitioner must demonstrate that new, reliable evidence—either eyewitness accounts, physical evidence, or exculpatory scientific evidence—establishes that it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. *House,* 547 U.S. at 536 (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner has not presented new, reliable evidence of his actual innocence. To support this claim, Petitioner relies on the fact that police found a .22 caliber rifle and drugs in a 2006 search of Kerry Rogers (Doc. 2, at 168). However, even if the Court assumes without finding that this evidence qualifies as newly-discovered though information about this search was publicly available to Petitioner*, see United States v. Rogers*, No. 1:06-CR-56, Doc. 44, at 3–5 (Oct. 6, 2006), prior to Petitioner's trial beginning in August 2009 (Doc. 9-3, at 1), and Petitioner's counsel had witness statements associating Kerry Rogers with the murders prior to

31

that trial, the fact that police found drugs and a firearm that used a type of ammunition found at the 1999 murder scene on Kerry Rogers seven years after those murders is insufficient to support Petitioner's gateway actual innocence claim.

Specifically, while the evidence regarding the 2006 search of Kerry Rogers establishes that police found a .22 caliber rifle and drugs, and other evidence in the record establishes that police found .22 caliber ammunition at the 1999 murder scene, the Sixth Circuit has noted that a .22 caliber gun is "a firearm commonly used in drug trafficking." *United States v. Lucas*, 529 F. App'x 463, 467 (6th Cir. 2013). No evidence in the record connects the .22 cartridges found at the scene of the 1999 murders to Kerry Rogers's rifle. But even if the Court assumes that they are connected, the evidence at Petitioner's trial established that he made multiple statements implicating himself in the 1999 murder/robbery incident to various witnesses. Moreover, one witness testified that Petitioner stated that he threw the gun he used in that incident in the Loudon County Rock Quarry.

Thus, after considering the totality of the evidence at Petitioner's trial and the evidence from the 2006 Kerry Rogers search, the Court finds that a reasonable juror still could have found Petitioner guilty beyond a reasonable doubt of the 1999 murders, even if Petitioner had presented evidence that police found a .22 caliber rifle and drugs in a 2006 search of Kerry Rogers at his trial. As such, this evidence does not excuse Petitioner's procedural default of any claims.

### 3. State Action

As set forth above, Petitioner also asserts that because Tennessee (1) restricts criminal defendants to one post-conviction petition and (2) does not provide a non-capital criminal petitioner seeking post-conviction relief with the opportunity to request funds for an investigator, while also requiring those petitioners alleging that counsel was ineffective for failing to properly

investigate their case and/or failing to present witnesses at trial to present evidence to establish prejudice resulting from those omissions in the post-conviction proceeding, this Court should excuse his procedural default of some claims. The Court will address these arguments in turn.

### a. One Petition

Under Tennessee law, a petitioner may file one petition for post-conviction relief from a criminal judgment. Tenn. Code Ann. § 40-30-102(c).[2] Tennessee courts therefore must summarily dismiss any successive petition. *Id.* Petitioner claims that this "one petition" rule prevented him from exhausting (1) constitutional claims for actual innocence based on newly discovered evidence and (2) later arising claims based on the prosecution's suppression of evidence, and thus excuses his procedural default of these claims.

### i. Actual Innocence

First, Petitioner relies on the fact that police found a .22 caliber rifle and drugs in a 2006 search of Kerry Rogers to support his actual innocence claim (*see*, *e.g.*, Doc. 2, at 9–10). However, § 2254 relief is not available for an actual innocence claim without an underlying constitutional violation in the criminal proceeding. *Herrera v. Collins*, 506 U.S. 390, 400 (1993) (holding that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding"). As set forth more fully herein, Petitioner has not established any such underlying constitutional violation. Further, as set forth above, the fact that police found a .22 caliber rifle and drugs in a 2006 search of Kerry Rogers does not excuse Petitioner's procedural default of any claims for § 2254 relief. Thus,

---

[2] A petitioner may file a motion to reopen his post-conviction petition under certain circumstances not applicable in this case. Tenn. Code Ann. § 40-30-117(a)(1)-(4).

33

Petitioner's inability to bring a claim for actual innocence based on newly discovered evidence under Tennessee law does not establish cause or prejudice to excuse his procedural default of any claim for § 2254 relief.

### ii. *Brady* Claims

Petitioner also argues that the Court should excuse his procedural default of his § 2254 claims for violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963) because the prosecution's suppression of evidence caused that default (*Id.* at 169). The Due Process Clause of the Fourteenth Amendment requires that the state disclose to criminal defendants "evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed." *California v. Trombetta*, 467 U.S. 479, 485 (1984) (citing *Brady*, 373 U.S. at 97). "Even in the absence of a specific request, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Id.* at 485 (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)).

To establish a violation of *Brady*, a petitioner must show that the state withheld evidence that was material to his guilt or punishment. *Brady*, 373 U.S. at 87. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted).

A *Brady* violation has three requirements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have

ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). However, no *Brady* violation exists if a defendant knew or had reason to know "'the essential facts permitting him to take advantage of any exculpatory information,'" or where the evidence was available to him from another source. *Abdur'Rahman v. Colson*, 649 F.3d 468, 474 (6th Cir. 2011), *cert. denied*, 133 S. Ct. 30 (2012) (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir.1991)).

To excuse procedural default of a *Brady* claim, a petitioner must demonstrate that the state's suppression of evidence caused his failure to develop the facts in the state court proceeding and that "the suppressed evidence is 'material' for *Brady* purposes." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler*, 527 U.S. at 282).

### (a)    Detective Brumley

Petitioner first claims that the prosecution and/or investigators suppressed records in possession of the Cleveland Police Department regarding Detective Brumley's disciplinary history and other evidence that would have called Detective Brumley's credibility into question (Doc. 1, at 19; Doc. 2, at 171–73; Doc. 16, at 44–49). Petitioner specifically alleges that Detective Brumley built the prosecution's case against him and testified that he had not coerced any witnesses into testifying against Petitioner, and that the prosecution presented Detective Brumley as having done an excellent investigation of Petitioner, without disclosing that Detective Brumley had threatened and intimidated witnesses into giving false testimony against him (Doc. 2, at 171–73).

However, as Respondent correctly points out, Petitioner has not set forth evidence that Detective Brumley threatened or intimidated any witness into testifying against him, nor has he identified evidence that the prosecution had reason to suspect Detective Brumley had coerced any witnesses into testifying in other cases before Petitioner's trial. Rather, the record

demonstrates that the prosecutor's concerns about Detective Brumley arose after Petitioner's trial, in Michael Younger's trial.

Moreover, to the extent that Petitioner argues that the prosecution violated *Brady* by not disclosing the fact that, in a case that predated his trial by several years,[3] a Court in this District found that Detective Brumley's testimony was inconsistent as to material facts and the Court therefore had no confidence in that testimony,[4] nothing in the record supports a finding that the prosecution suppressed publicly available evidence of this incident. Nor does the record support a finding that, if Detective Brumley had been impeached through evidence of the *Little* case finding and/or the other alleged wrongdoing that the prosecution cited in the motion to nolle prosequi the charges against Michael Younger during Petitioner's trial, there is a reasonable probability that this would have changed the result.

Specifically, while evidence of such wrongdoing likely would have marginally undermined Detective Brumley's overall credibility, including his testimony that he did not coerce witnesses to testify against Petitioner (Doc. 9-7, at 118), the evidence of Petitioner's guilt at his trial, including Petitioner's statements to various witnesses incriminating himself in the 1999 murders, was substantial, and Petitioner has not established that any such evidence was the result of Detective Brumley's wrongdoing. Thus, any evidence that would marginally undermine Detective Brumley's credibility does not create a reasonable probability of a different result in Petitioner's trial, and therefore was not material.

Accordingly, Petitioner has not shown cause and prejudice to excuse his procedural default of this claim, and the Court will not consider it on the merits.

---

[3] *United States v. Little*, No. 1:00-CR-136 (E.D. Tenn. Aug. 16, 2001).
[4] This was one incident the prosecution cited in its motion to nolle prosequi the charges against Mr. Younger. *Johnson II*, at *9.

36

### (b)    Third Party Guilt

In Claims 20 and 22, Petitioner argues that the prosecution suppressed evidence of guilt of third parties, including Stacy Clabough, Kerry Rogers, and three white men Twanna Blair stated were responsible, and specifically alleges that the prosecution suppressed a statement from Antwon Cook implicating Kerry Rogers (Doc. 1, at 20; Doc. 2, at 174–77; Doc. 16, at 49–52). However, the evidence at Petitioner's post-conviction hearing established that Antwon Cook's statement regarding Kerry Rogers, a lead sheet that included information regarding Stacy Clabough and other witness statements, and a document recounting Twanna Blair's statement that three white men were responsible were in the discovery that Petitioner's investigator reviewed (*see*, *e.g.*, Doc. 9-39, at 52–59, 70; Doc. 9-47, at 73)  Moreover, counsel for Petitioner referenced Twanna Blair's statement regarding three white men during Petitioner's trial (Doc. 9-3, at 116).

Thus, the record does not support Petitioner's conclusory allegations that the prosecutor suppressed evidence relating to the guilt of other individuals, Petitioner has not overcome his procedural default of this claim, and the Court will not address it on the merits.

### (c)    Twanna Blair's Gun Powder Residue Test

Petitioner next argues that the prosecution suppressed evidence that Twanna Blair's hands tested positive for gun powder residue (Doc. 1, at 20; Doc. 2, at 176; Doc. 16, at 50–51). At Petitioner's post-conviction hearing, counsel testified that the fact that Twanna Blair's hands were tested for gun powder residue "sound[ed] familiar," but he did not recognize the report with the positive results of that test (Doc. 9-40, at 7), which indicated that Twanna Blair "could have fired, handled, or was near a gun when it was fired" (Doc. 9-48, at 88).  Even if the Court

37

assumes without finding that the prosecution suppressed this report based on this testimony, however, the record does not support a finding that this report was material.

Specifically, as set forth above, the evidence in Petitioner's trial established that Ms. Blair was shot in the 1999 triple murder incident. Thus, Ms. Blair's positive gun powder residue report does not create a reasonable probability of a different result in Petitioner's trial, as a logical explanation for that positive result is that she was near a gun when someone fired it and shot her.

Moreover, the fact that Ms. Blair was charged in the indictment as Petitioner's codefendant in the 1999 murders makes her positive gunshot powder residue report even less probative. As set forth above, the prosecution presented considerable evidence from varying sources of Petitioner's motive for and involvement in the attempted robbery that resulted in 1999 murders. Thus, even if jurors reasonably construed Ms. Blair's positive gunshot residue report as evidence that she shot one or more of the victims, this would not create a reasonable probability of a different result in Petitioner's trial, as the significant evidence that Petitioner participated in the murder/robbery incident would still support finding him guilty of the three felony-murder charges under Tennessee law. *State v. Dorantes*, 331 S.W.3d 370, 386 (Tenn. 2011) (noting that, under Tennessee law, a defendant's presence and companionship with a perpetrator where the defendant shared criminal intent and promoted the commission of the crime subjects the defendant to conviction under the theory of criminal responsibility) (citing Tenn. Code Ann. §§ 39–11–401 and 402 (1997)).

As such, Petitioner has not established that this report was material and thus has not overcome his procedural default of this *Brady* claim.

### (d)    Kerry Rogers's Rifle

Petitioner also argues that the prosecution violated *Brady* by suppressing evidence of the 2006 search of Kerry Rogers in which police found a .22 rifle. However, as noted above, all relevant information about this search was publicly available through the Court's CM/ECF system, *see United States v. Rogers*, No. 1:06-CR-56, Doc. 44, at 3–5 (filed Oct. 6, 2006) prior to Petitioner's criminal trial beginning on August 29, 2009 (Doc. 9-3, at 1), and the record establishes that Petitioner received multiple witness statements associating Kerry Rogers with the murders in discovery documents prior to his trial.

Thus, Petitioner had all essential facts from which he could have found this evidence, and no *Brady* violation occurred. *Abdur'Rahman v. Colson*, 649 F.3d at 474. Further, as noted above, given the substantial evidence of Petitioner's involvement in the 1999 triple murder/robbery incident, evidence that Kerry Rogers possessed a .22 rifle in 2006 would not create a reasonable probability of a different result in Petitioner's trial, even if it were connected to the 1999 murders.

As such, Petitioner has not set forth cause or prejudice to excuse his default of this claim, and the Court will not address it on the merits.

### b. Tennessee Supreme Court Rule 13

Petitioner additionally claims that the Court should excuse his procedural default of some claims because Tennessee law requires post-conviction petitioners challenging the effectiveness of their counsel's investigation of their case and/or the fact that their counsel failed to present witnesses at trial to present evidence that these acts or omissions prejudiced them, but Tennessee Supreme Court Rule 13 does not allow non-capital defendants to obtain funds to hire an investigator in post-conviction proceedings (Doc. 2, at 8–10 (citing *Brewer v. State*, No. W2016-02106-CCA-R3-PC, 2018 WL 446686, at *4 (Tenn. Crim. App. Jan. 16, 2018) (acknowledging

"that a 'Catch–22' dilemma exists because of Tenn. S. Ct. R. 13, § 5," because Tennessee requires indigent post-conviction petitioners seeking relief based on the allegation that counsel was ineffective for failing to present expert testimony to present an expert witness to prove prejudice resulted from the lack of expert testimony at trial, but Tennessee Supreme Court Rule 13 § 5 prohibits funding for such an expert in a non-capital post-conviction case)).  In response to this argument, Respondent points out that the Supreme Court has found that states have no obligation to provide post-conviction review to collaterally attack a conviction, and therefore asserts that Tennessee Supreme Court Rule 13 cannot excuse Petitioner's default of any claims (Doc. 10, at 29–30 (citing *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987)).

But even if the Court accepts as true that Tennessee Supreme Court Rule 13 prevents non-capital indigent post-conviction petitioners from obtaining funds for an investigator and therefore creates a barrier for an indigent petitioner challenging the effectiveness of his trial counsel's investigation and/or failure to present witnesses that is, at a minimum, unjust, because Tennessee both (1) requires post-conviction petitioners to assert ineffective assistance of counsel claims in the post-conviction proceeding and (2) requires post-conviction petitioners asserting that counsel was ineffective in investigating and/or presenting witnesses at trial to present evidence that the deficiency prejudiced them, Petitioner has not established that this apparent inequity entitles him to § 2254 relief.

Specifically, while Petitioner relies on Tennessee Supreme Court Rule 13 to excuse his procedural default of claims, it is apparent from his filings and the fact that he exhausted claims challenging his counsel's investigation and failure to present witnesses that he actually seeks to challenge the TCCA's finding that he was not entitled to relief for those claims due to his failure to present evidence of any prejudice to him from counsel's deficient investigation and/or lack of

witnesses,[5] *Johnson II*, at *18–21, by asserting that Tennessee Supreme Court Rule 13 was the reason he was unable to prove prejudice. However, Petitioner did not challenge this Rule in the state courts. Moreover, Petitioner has not set forth proof that his post-conviction counsel (1) could not find witnesses to support these claims due to not having an investigator, or (2) sought to obtain funds for an investigator but could not due to Tennessee Supreme Court Rule 13.

Accordingly, Petitioner has not established that Tennessee Supreme Court Rule 13 excuses his procedural default of any claim, and the Court will not review any claims on the merits based on Petitioner's arguments related to that Rule.

### B. Petitioner's Claims

#### 1. Insufficient Evidence

In Claim 1, Petitioner challenges the sufficiency of the evidence in support of his three felony-murder convictions (Doc. 1, at 4; Doc. 2, at 56–61; Doc. 16, at 13–18). As set forth above, in his direct appeal of his convictions to the TCCA, Petitioner argued that the evidence was insufficient to establish that he committed a robbery and therefore, that his convictions for especially aggravated robbery and felony murder must be thrown out (Doc. 9-13, at 17–19). In analyzing this claim, TCCA set forth the following legal standard and summary of the required elements of Petitioner's convictions under Tennessee law:

> Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys

---

[5] While Petitioner did not exhaust his claim that his counsel's ineffective investigation of his case violated *United States v. Cronic*, 466 U.S. 648 (1984) a successful *Cronic* claim results in a presumption of prejudice, *id.* at 659, so Petitioner's assertion that Tennessee Supreme Court Rule 13 prevented him from proving prejudice would not have any effect on such a claim.

41

the presumption of innocence and imposes a presumption of guilt. *See State v. Evans,* 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers,* 35 S.W.3d 516, 557–58 (Tenn. 2000); *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Hall,* 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers,* 35 S.W.3d at 558; *Hall,* 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *See Evans,* 108 S.W.3d at 236; *Bland,* 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See Evans,* 108 S.W.3d at 236–37; *Carruthers,* 35 S.W.3d at 557.

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass,* 13 S.W.3d 389, 392–93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Dorantes,* 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Tharpe,* 726 S.W.2d 896, 899–900 (Tenn. 1987). Recently, our supreme court adopted the position of the United States Supreme Court "that direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *Dorantes,* 331 S.W.3d at 379–81. In *Dorantes,* the supreme court specifically rejected the holding in *State v. Crawford,* 225 Tenn. 478, 470 S.W.2d 610 (Tenn. 1971), requiring that in a wholly circumstantial evidence case the State "prove facts and circumstances 'so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt.'" *Id.* at 380, 470 S.W.2d 610 (quoting *Crawford,* 470 S.W.2d at 612). Accordingly, the State is no longer required to "exclude every other reasonable hypothesis save the guilt of the defendant" to obtain a conviction based solely on circumstantial evidence and need only establish the constitutionally required standard of proof beyond a reasonable doubt. *Id.* at 381, 470 S.W.2d 610. Ultimately, how much weight to give circumstantial evidence and the extent to which such evidence is consistent with guilt or inconsistent with innocence are questions for the jury. *Dorantes,* 331 S.W.3d at 379; *Smith v. State,* 205 Tenn. 502, 327 S.W.2d 308, 318 (Tenn.1959).

Relevant to this case, felony murder is "a killing of another committed in the perpetration of or attempt to perpetrate any… robbery." Tenn. Code Ann. § 39–13–202(a)(2). Tennessee Code Annotated section 39–13–202 also provides that "[n]o culpable mental state is required for conviction under subdivision (a)(2). . . except the intent to commit the enumerated offenses or acts." Tenn. Code Ann. § 39–13–202(b). Additionally, the death must occur "in the perpetration of" the enumerated felony. *State v. Hinton,* 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000) (citations omitted). The killing may precede, coincide with, or follow the felony and still be in the perpetration of the felony, so long as there is a connection in time, place, and continuity of action. *State v. Buggs,* 995 S.W.2d 102, 106 (Tenn. 1999). If the underlying felony and killing were part of a continuous transaction with no break in the chain of events and the felon had not reached a place of temporary safety between the events, felony murder is sufficiently established. *State v. Pierce,* 23 S.W.3d 289, 294–97 (Tenn. 2000). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. *Buggs,* 995 S.W.2d at 107.

In this case, the underlying felony charged in the indictment is especially aggravated robbery. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39–13–401(a). Theft is defined as the following: "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39–14–103. To sustain a conviction for especially aggravated robbery, the evidence must establish that a defendant robbed the victim with a deadly weapon and that the victim suffered serious bodily injury. Tenn. Code Ann. § 39–13–403(a).

Under Tennessee law, the proof must show that the killings were committed during the perpetration of an especially aggravated robbery or the attempt to perpetrate an especially aggravated robbery.

*State v. Johnson*, No. E2010-01142-CCA-R3CD, 2011 WL 3586557, at *8–10 (Tenn. Crim. App. Aug. 16, 2011). The TCCA then summarized Petitioner's claim and the relevant evidence presented at his trial before rejecting Petitioner's argument that, as the prosecution admitted that any property that Petitioner took or attempted to take from OJ Blair was actually Petitioner's, the evidence was insufficient to support his especially aggravated robbery conviction and/or resulting felony-murder convictions. *Id.* at *10–12. The TCCA specifically found that, under Tennessee law, OJ Blair did not have to be in lawful possession of any money or drugs for

Petitioner to be guilty of robbery in taking those items, and that as Petitioner "had no authority to exert control over the property," he was not entitled to relief for this argument.  *Id.* at *12.

The TCCA further held that, viewed in the light most favorable to the prosecution, the evidence at Petitioner's trial, including testimony from Stacy Clabough and testimony regarding Petitioner's various confessions, supported finding that Petitioner was responsible for the murders.  *Id.* at *13.  It also noted that other evidence at the trial, including testimony from Amy Lonas, suggested that Petitioner had gone to the residence where the murders occurred to collect a debt, inferentially from Petitioner "fronting" drugs, from OJ Blair.  *Id.*  The TCCA therefore held that the evidence was sufficient to support Petitioner's felony-murder convictions, as it supported a finding that Petitioner had committed the murders in the perpetration or attempted perpetration of a robbery.  *Id.* at *13 (citing Tenn. Code Ann. § 39-13-202(a)(2)).

However, the TCCA additionally found that, as no evidence suggested that Petitioner obtained or exercised control over any property taken in the 1999 murder incident, it was insufficient to support finding that the robbery underlying those murders proceeded past an attempt.  *Id.*  The TCCA further noted that although the evidence supported a conviction of Petitioner for attempted especially aggravated robbery, which is a lesser included offense of especially aggravated robbery, the statute of limitations for any such charge had run, and at trial Petitioner had objected to charging any lesser included offenses on the ground of the statute of limitations.  *Id.*  Accordingly, the TCCA reversed Petitioner's conviction for especially aggravated robbery and dismissed that charge.  *Id.*

Petitioner has not met his burden to establish that this was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented.  The Court agrees with the TCCA that, viewing the evidence at Petitioner's trial in the light most

favorable to the prosecution, a reasonable juror could have found that Petitioner murdered the victims after going to the residence collect money and/or drugs that were in OJ Blair's possession, and thus this evidence was sufficient for a reasonable juror to find Petitioner guilty of the required elements of first degree felony murder in Tenn. Code Ann. 39-13-202(a) (2007).[6]

Accordingly, Petitioner is not entitled to relief under §2254 for this claim.

## 2. Ineffective-Assistance-of-Trial-Counsel Claims

---

[6] In his § 2254 memorandum and reply, Petitioner asserts that TCCA's finding that the evidence was sufficient to support his felony-murder convictions based on an attempted robbery is flawed because (1) he could not be convicted of felony murder based on an attempted especially aggravated burglary, as the indictment did not charge him with felony murder predicated on an attempted especially aggravated burglary, and (2) the evidence did not establish that the victims suffered a serious bodily injury, rather than immediate death (Doc. 2, at 58–61; Doc. 60, at 14–15). But he did not exhaust these theories underlying his insufficiency of evidence claim with the TCCA, and he has not presented cause and prejudice to excuse this procedural default.

Specifically, Petitioner's argument that the indictment had to specify that the murders occurred during an attempted especially aggravated robbery in order for the TCCA to find that he was guilty of three felony murders during an attempted especially aggravated robbery does not challenge the evidence underlying his felony-murder convictions. Rather, it challenges the validity of the indictment and/or the TCCA's ability to find the murder convictions were valid based on evidence that Petitioner committed them in an attempted especially aggravated murder, even without evidence that Petitioner completed that attempt. Again, however, Petitioner did not present any such theories to the TCCA, thus the Court will not address their merits.

Also, Petitioner notably cites no evidence in the record to support his assertion that the victims immediately died from gunshot wounds, which he argues supports his argument that they did not suffer serious bodily injury as required for him to be guilty of an attempted especially robbery, and the Court has not located any such evidence in the trial court record. Regardless, the Tennessee Court of Appeals has held that where the evidence established that a victim died of a shotgun wound in a failed robbery event, that was sufficient to support a felony-murder conviction under Tenn. Code. Ann. 39-13-202(2) based on especially aggravated robbery. *State v. Cureton*, 38 S.W.3d 64, 74 (Tenn. Crim. App. 2000). Additionally, the evidence in the record establishes that Twanna Blair sustained a serious bodily injury, for which she was taken to the hospital after police arrived, in the 1999 murder and attempted robbery incident underlying Petitioner's convictions (Doc. 9-3, at 85–86, 90–91, 114–15). Thus, this argument is without merit.

45

### a. Standard

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This includes the right to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. A petitioner has the burden of proving ineffective assistance of his counsel. *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. To meet this prong, a petitioner must demonstrate that his counsel was so deficient that he no longer "function[ed] as the 'counsel' guaranteed under the Sixth Amendment." *Id.* at 687. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally

unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

The Supreme Court has emphasized that a claimant must establish both prongs of a claim for ineffective assistance of counsel to meet his burden, and, if either prong is not satisfied, the claim fails. *Id.* at 687. Moreover, a habeas petitioner alleging ineffective assistance of counsel bears a heavy burden, given the "doubly deferential" review of a such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### b. Detective Brumley

In Claim 2, Petitioner argues that counsel was ineffective for (1) failing to fully investigate the case and interview all witnesses about Detective Brumley's having threatened or intimidated them into making materially false statements, and (2) failing to investigate Detective Brumley's disciplinary history (Doc. 1, at 5; Doc. 2, at 61–66; Doc. 16, at 20–23). Respondent asserts that Petitioner exhausted this claim with the TCCA in his general claim challenging his trial counsel's investigation of his case in his appeal of the denial of post-conviction relief (Doc. 10, at 56–57). However, in the section of the brief containing this argument, Petitioner does not refer to counsel's failure to interview witnesses about coercion from Detective Brumley or his failure to investigate Detective Brumley's disciplinary history (Doc. 9-49, at 40–61). Thus, to the extent that Petitioner raised this claim in his petition for post-conviction relief (Doc. 9-19, at 43–47) but did not fairly raise this theory in his appeal (Doc. 9-49), he procedurally defaulted this claim, and *Martinez* cannot excuse this procedural default. *See Middlebrooks*, 843 F.3d at 1136 (stating that *Martinez* did not apply "because those claims were raised and rejected on the merits by the initial postconviction court, and ineffective assistance of counsel on post-conviction appeal cannot establish 'cause' to excuse [petitioner]'s procedural default, which

47

occurred only in the Tennessee Court of Criminal Appeals"). Moreover, Petitioner has presented no other cause and prejudice to excuse this default.

Also, even if Respondent is correct and the Court could construe Petitioner's general argument challenging his counsel's investigation in his appellate brief to encompass Petitioner's claim that counsel was deficient for failing to investigate whether Detective Brumley coerced witnesses into testifying against him and Detective Brumley's disciplinary history, the TCCA denied Petitioner relief for this claim due to his failure to present evidence of any resulting prejudice to his case. *Johnson II*, at *18–21. Petitioner has not established that this finding was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented with regard to this claim. Specifically, Petitioner has failed point to any evidence in the record that his counsel's lack of investigation of Detective Brumley's disciplinary history and/or coercion of witnesses prejudiced him. He has not cited evidence that Detective Brumley improperly coerced any witness at his trial into giving incriminating testimony against him, or any information in Detective Brumley's disciplinary history that, if presented at his trial, would have discredited Detective Brumley's testimony such that it would have caused in a different result therein. As set forth above, the allegations in the prosecution's motion to nolle prosequi the charges against Michael Younger are insufficient to meet this requirement.

Thus, Petitioner has not established that he is entitled to relief under § 2254 for this claim.

### c. Phone Call Between Petitioner and BJ Colquitt

In Claim 3, Petitioner claims that counsel was ineffective for failing to object to the playing of a recorded phone call between Petitioner and BJ Colquitt at his trial (Doc. 1, at 6;

48

Doc. 2, at 67–72; Doc. 16, at 23–24). However, Petitioner raised this claim in his petition for post-conviction relief (Doc. 9-30, at 55–61) but not in his appeal of the denial of post-conviction relief (Doc. 9-49). Accordingly, he procedurally defaulted this claim only in his appeal of the denial of his petition for post-conviction relief to the TCCA, and *Martinez* therefore cannot excuse that default. *See Middlebrooks*, 843 F.3d at 1136. Moreover, Petitioner has presented no other cause and prejudice to excuse this default, as set forth above.

Thus, Petitioner is not entitled to relief under § 2254 for this claim.

### d. Witnesses as Mere Ruse

In Claim 4, Petitioner claims that counsel was ineffective for failing to object to, and request a mistrial based upon, the prosecution calling numerous witnesses as a mere ruse to introduce improper and prejudicial evidence and failing to raise this issue as plain error in the motion for new trial and direct appeal (Doc. 1, at 7-8; Doc. 2, at 73–79; Doc. 16, at 24–25). As to his assertion that this was deficient performance by his trial counsel, Petitioner raised this claim in his petition for post-conviction relief (Doc. 9-30, at 55–61) but not in his appeal of the denial of post-conviction relief (Doc. 9-49). Accordingly, he again procedurally defaulted this claim only in the TCCA, and *Martinez* cannot excuse this default. *Middlebrooks*, 843 F.3d at 1136. Moreover, Petitioner has presented no other cause and prejudice to excuse this default, as the Court explained above.

Likewise, *Martinez* does not excuse Petitioner's procedural default of his claim that his appellate counsel was deficient for failing to raise this claim, which he did not raise in his state court post-conviction proceedings (Doc. 9-49). *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017) (declining to extend the scope of *Martinez* to include procedurally defaulted claims of ineffective assistance of direct appellate counsel due to ineffectiveness of post-conviction counsel).

49

Thus, Petitioner is not entitled to relief under § 2254 for this claim.

### e. Twanna Blair

In Claim 5, Petitioner claims that counsel was ineffective for failing to cross-examine or otherwise question Twanna Blair about her pretrial statements (Doc. 1, at 14; Doc. 2, at 79–88; Doc. 16, at 25–26). Petitioner exhausted this claim with the TCCA, which analyzed it as follows:

> [] Petitioner additionally contends that he was denied the effective assistance of counsel based on trial counsel's failure to question Defendant Blair about her initial statement to police, in which she alleged that the perpetrators were white men. [] Petitioner asserts that, by failing to challenge Defendant Blair's "blanket assertion" of her Fifth Amendment rights, trial counsel "abandoned a fertile ground for exculpatory proof."

> The post-conviction court noted that [] Petitioner failed to introduce Defendant Blair's purported statement "in any form" at the post-conviction hearing. The post-conviction court found that, by failing to introduce evidence regarding the statement, [] Petitioner failed to establish that trial counsel's handling of the statement prejudiced [] Petitioner. The post-conviction court reasoned that "[e]ven if trial counsel had successfully argued Defendant Blair was not subject to Fifth Amendment protections, this Court can only speculate as to whether Defendant Blair, had the trial court allowed questioning on the matter, would have offered credible testimony consistent with her earlier statements to police."

> We agree with the post-conviction court's conclusions. Because neither Defendant Blair nor the officer to whom she allegedly gave the statement testified at the evidentiary hearing, [] Petitioner has not established prejudice. *Black*, 794 S.W.2d at 758. This court can only speculate about this issue. Accordingly, [] Petitioner is not entitled to relief based on this claim.

*Johnson II*, at *23.

Petitioner has not established that this finding was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. While the Court has located a document in the technical record of Petitioner's state court post-conviction proceedings in which Detective Brumley summarizes an interview with Jill Flowers by stating

50

that Ms. Flowers told him that Twanna Blair told her that three white men were responsible for the 1999 murders (Doc. 9-47, at 72–74), Petitioner has cited no proof that, if his counsel had asked Twanna Blair about this statement, she would have confirmed that she told Jill Flowers this and that it was the truth, or otherwise would have testified in a manner that would have resulted in a different result in his trial, especially as Twanna Blair was charged as Petitioner's codefendant. Thus, Petitioner has failed to meet his burden to establish that his counsel's failure to question Twanna Blair about this statement prejudiced him under *Strickland*.

Accordingly, Petitioner is not entitled to relief under § 2254 for this claim.

### f. Investigation and Witnesses

In Claim 6, Petitioner claims that counsel was ineffective for failing to interview, subpoena, and/or otherwise use various individuals as witnesses (Doc. 1, at 14–15; Doc. 2, at 88–93; Doc. 16, at 26–28). Petitioner properly exhausted this claim with the TCCA, which analyzed it as follows:

> [] Petitioner contends that trial counsel rendered ineffective assistance based on his failure to investigate potential witnesses and potential exculpatory information contained in discovery. [] Petitioner asserts that because of the lack of any real investigation, trial counsel was unaware that multiple individuals had implicated a third party in the murders, thereby depriving [] Petitioner of his ability to effectively raise the defense of third-party guilt. The State responds that [] Petitioner failed to prove that trial counsel rendered ineffective assistance of counsel for failing to investigate witnesses when those witnesses were not called at the evidentiary hearing.

> In denying relief, the post-conviction court found that trial counsel's preparation to try [] Petitioner's case was "inadequate," explaining that "[trial] [c]ounsel should have taken a more active role in directing Mr. Cohan to review discovery, interview witnesses, and conduct a thorough factual investigation, particularly in light of the State's seeking the death penalty at trial." The post-conviction court stated:

>> The discovery in this case referenced numerous potential witnesses who at one point either implicated someone other than [] [P]etitioner as the perpetrator of these offenses or stated []

51

[P]etitioner was not involved in committing the offenses. One would expect a reasonable defense attorney to have investigated the veracity of these statements through interviewing these potential witnesses and determining whether this information would have been beneficial for [] [P]etitioner at trial. Trial counsel failed to do so in this case; trial counsel's failure to pursue this potentially exculpatory information constituted deficient performance.

However, because [] Petitioner failed to present any of the potential witnesses at the post-conviction hearing, the post-conviction court could not determine "whether any of these witnesses would have offered credible trial testimony consistent with their purportedly exculpatory statements." Accordingly, the post-conviction court found that [] Petitioner failed to establish that he was prejudiced by trial counsel's failure to investigate and present the witnesses at trial.

Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see also State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

When a petitioner claims that trial counsel was ineffective for failing to discover, interview, or present a witness in support of the petitioner's defense, such witness should be presented at the post-conviction hearing. *State v. Black*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As this court has previously stated:

> As a general rule, this is the only way the petitioner can establish that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner. It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel.

*Id.* Without presenting the witness's testimony at the post-conviction hearing, the petitioner generally cannot establish prejudice under *Strickland*. *Id.* at 758.

We agree with the post-conviction court that trial counsel's investigation into potential witnesses was inadequate and deficient. Nevertheless, we also agree with the post-conviction court that [] Petitioner has not established that he was prejudiced by trial counsel's deficient performance. Although we certainly do not condone trial counsel's failure to conduct a proper investigation, the record reflects that only trial counsel, co-counsel, and the defense investigator testified at the post-conviction hearing. [] Petitioner failed to offer the testimony of any of the potential witnesses whom he contends that trial counsel should have investigated. [] Petitioner asserts that the post-conviction court did not need to speculate as to the potential witnesses' trial testimony because the witnesses had given prior statements to police, which [] Petitioner introduced as exhibits at the hearing. However, without the witnesses' testimony at the post-conviction hearing, it is impossible to conclude that the witnesses would have testified credibly and consistently about their prior statements to police and implicated other individuals in the crime. The witnesses could have simply recanted their statements if called to testify. Moreover, we cannot properly evaluate these statements as we have no way of knowing the circumstances under which the statements were made or the source of the witnesses' knowledge. As such, [] Petitioner has not established prejudice under *Black*.

[] Petitioner argues that "the holding in *Black* [ ] does not apply" to his case, citing the unpublished case of *Tavarus U. Williams v. State*, No. 02C01–9711–CR–00423, 1998 WL 742348, at *7 (Tenn. Crim. App. Oct. 23, 1998). In *Tavarus U. Williams*, the fifteen-year-old petitioner shot and killed the victim outside of a bar in Memphis. *Id.* at *1. The petitioner was tried as an adult and convicted by a jury of first degree premeditated murder, for which he received a life sentence. *Id.* At an evidentiary hearing on his post-conviction petition, the defense investigator testified that she located an unbiased eyewitness, who was available and willing to testify on the day of trial that the victim had been pulling a gun on the petitioner when the petitioner shot him, but the eyewitness was not called to testify due to trial counsel's lack of preparation. *Id.* at *3–4. The eyewitness's name was not recorded, and the defense investigator could not recall the name during the evidentiary hearing. *Id.* at *7. The post-conviction court denied relief on the claim of ineffective assistance of counsel because of the petitioner's failure to call the eyewitness at the post-conviction hearing. *Id.* On appeal, this court concluded that it was "fundamentally unfair to hold this failure of proof against the [Petitioner]" when the defense investigator had no written record of the eyewitness's name and could not recall it, and trial counsel testified that he had never known about the witness. *Id.* The court, therefore, concluded that the best evidence the petitioner had of the crucial testimony was the defense investigator's testimony, which he produced at the hearing. *Id.* Accordingly, the court held that the *Black* rule was inapplicable to the petitioner's case. *Id.*

53

*Tarvarus U. Williams* is distinguishable from the instant case. In this case, the defense investigator, Mr. Cohan, did not interview the potential witnesses advanced by [] Petitioner nor did he testify that they were readily available and willing to appear at trial. Mr. Cohan admitted that he did not know whether any of the potential witnesses could have been found or whether they would have talked to him. Unlike the situation in *Tarvarus U. Williams*, the identities of the potential witnesses are easily ascertainable through the records provided to [] Petitioner in discovery and admitted as exhibits at the post-conviction hearing. In his brief, [] Petitioner asserts that the passage of time has caused the potential witnesses to be unavailable, but he offered no proof at the evidentiary hearing that he sought out any of these witnesses but was unable to locate them. *Tarvarus U. Williams* does not apply to the instant case, and [] Petitioner failed to establish prejudice under *Black*. Accordingly, he is not entitled to relief.

*Johnson II*, at *18–20.

Petitioner has not established that this was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. While Petitioner makes a number of allegations regarding what various individuals would have testified about if called at his trial in his § 2254 memorandum, Petitioner has not set forth proof to support these assertions. He also has not pointed to any statements in the record that (1) establish that the uncalled witness would have testified in accordance with that statement at Petitioner's trial and (2) contain sworn testimony that would have resulted in a different result if presented at Petitioner's trial. Without such proof, the Court cannot determine that Petitioner's counsel's failure to further investigate and/or present witnesses prejudiced Petitioner, as *Strickland* requires. *Fitchett v. Perry*, 644 F. App'x 485, 489–90 (6th Cir. 2016).

In his reply, Petitioner argues that the record contains proof in support about what evidence witnesses in the record that his counsel did not interview and/or present at trial would have provided if called at his trial (*see*, *e.g.*, Doc. 16, at 11, 22 (citing *Stegall v. Nagy*, No. 18-1956, 2018 WL 6133763, at *4 (6th Cir. Nov. 19, 2018) (stating that "[w]hen a habeas petitioner claims that his attorney was ineffective because he failed to investigate a potential trial witness,

the petitioner must support the claim with evidence, such as an affidavit from the witness, describing the specific facts about which the witness could have testified" (citing *Fitchett*, 644 F. App'x at 489)))). However, while the record contains a number of lead sheets, interview summaries, and sworn and unsworn witness statements that were exhibits in the hearing on Petitioner's post-conviction petition (Doc 9-47; Doc. 9-48, at 1–42), and many of these documents contain statements indicating that third parties were involved in the 1999 murders, most of these documents predate Petitioner's trial by several years, and Petitioner has not presented evidence that these witnesses would have testified in accordance therewith at his trial. Further, Petitioner does not state what admissible information in these documents these witnesses would have presented at his trial that would have changed the result, and the Court has not located any such evidence. As such, he has not established that his counsel's failure to investigate these individuals and/or call them as witnesses prejudiced him.

Thus, Petitioner has failed to establish that he is entitled to relief under § 2254 for this claim.

### g. Petitioner's Incarceration

In Claim 7, Petitioner claims that counsel was ineffective for telling the jury that Petitioner was incarcerated (Doc. 1, at 15; Doc. 2, at 94–97; Doc. 16, at 28). However, Petitioner raised this claim in his petition for post-conviction relief (Doc. 9-30, at 83–87) but not in his appeal of the denial of post-conviction relief (Doc. 9-49). Accordingly, he again procedurally defaulted these claims only in the TCCA, and *Martinez* cannot excuse this procedural default. *Middlebrooks*, 843 F.3d at 1136. Moreover, as fully addressed above, Petitioner has presented no other cause and prejudice to excuse this default. Thus, the Court will not address the merits of this claim.

### h. Petitioner's Prior Bad Acts

In Claim 8, Petitioner claims that trial counsel was ineffective for introducing and/or not objecting to evidence of:

a. Petitioner's prior womanizing;
b. Drug-related activity;
c. The fight between Petitioner and OJ Blair;
d. The breaking of the door off the hinge at Amy Lonas's residence; and
e. Other prior charged, convicted, and/or uncharged bad conduct of Petitioner.

(Doc. 1, at 15; Doc. 2, at 97–110; Doc. 16, at 29–30.)

Petitioner raised claims 8(a), 8(d), and 8(e) in his post-conviction petition (Doc. 9-30, at 87–100) but not in his appeal of the denial of that petition (Doc. 9-49). Accordingly, he again procedurally defaulted this claim only in the TCCA, and *Martinez* cannot excuse this procedural default. *Middlebrooks*, 843 F.3d at 1136. Moreover, Petitioner has presented no other cause and prejudice to excuse the default of these claims, and the Court will not address them on the merits.

However, Petitioner fully exhausted claims 8(b) and (c) with the TCCA, which analyzed them as follows:

[] Petitioner further avers that trial counsel rendered ineffective assistance of counsel based on trial counsel's failure to object to testimony regarding the Sweetwater fight and his prior drug dealing. [] Petitioner argues that trial counsel should have objected to testimony about the Sweetwater fight because motive is not relevant in a trial for felony murder. Additionally, he argues that trial counsel's strategy to actively discuss [] Petitioner's prior drug dealing and federal drug conviction was unsound and based on an "erroneous view of the law."

### a. Fight at the Sweetwater party

In ruling on this issue, the post-conviction court noted that [] Petitioner was charged with especially aggravated robbery, and therefore, the State was entitled to present evidence of a potential motive for especially aggravated robbery. Specifically, the State introduced evidence that [] Petitioner and OJ Blair were involved in a fight at the Sweetwater party, which led [] Petitioner to go to the victim's residence in an attempt to recover his money. Additionally, the post-conviction court found that, in an attempt to limit the testimony of some witnesses

56

about the Sweetwater fight, trial counsel objected numerous times, and the trial court conducted several Rule 404(b) hearings on the issue.

We agree with the post-conviction court that evidence of the Sweetwater fight was relevant to establish motive for the underlying offense of especially aggravated robbery. This court has previously recognized that evidence of prior bad acts can be admissible to prove a motive for a robbery. *See e.g., State v. Cory Shane Rollins*, No. E2008–01407–CCA–R3–CD, 2010 WL 342653, at *8–9 (Tenn. Crim. App. Feb. 1, 2010), *perm. app. denied* (Tenn. June 17, 2010). [] Petitioner has not established deficient performance or prejudice in regards to trial counsel's failure to object to evidence regarding the fight at the Sweetwater party. Accordingly, he is not entitled to relief. *Strickland*, 466 U.S. at 687.

### b. Drug dealing

The post-conviction court found that [] Petitioner testified [] to refute the numerous witnesses who testified about [] Petitioner's inculpatory statements. [] Petitioner's testimony necessarily "meant [that] the [S]tate would be able to impeach [][P]etitioner with proof regarding his federal felony conviction for selling cocaine." The post-conviction court found that trial counsel made the "'strategic decision' to attempt to control the narrative of [] Petitioner's past drug dealing, addressing this history directly and presenting evidence that he began selling drugs as a means of supporting his family." The post-conviction court reasoned:

> The strategy put forth by trial counsel—that [] Petitioner was a drug dealer, even one who ultimately went to prison because of his actions, but he was not capable of killing someone—was not ideal, but counsel's hand was somewhat forced given the numerous witnesses relating [] [P]etitioner's purported inculpatory statements, Ms. Lonas' testimony about [] [P]etitioner "fronting" OJ Blair drugs, and [] [P]etitioner's choice to testify.

The post-conviction court found that counsels' handling of the issue of [] Petitioner's drug dealing "represented their attempts to make the best of a bad situation" and was "within the range of competence demanded of attorneys in criminal cases[.]" Accordingly, the post-conviction court found that trial counsel's performance was not deficient and denied relief.

Upon review, we conclude that the evidence does not preponderate against the post-conviction court's findings. Trial counsel testified that, as part of trial strategy, he decided to have [] Petitioner testify and admit that he was a convicted drug dealer. Trial counsel explained that his strategy was to be forthright with the

57

jury regarding [] Petitioner's drug dealing while advancing the theory that []
Petitioner was "not the type of person who would kill someone." Trial counsel
knew that [] Petitioner's drug dealing would come to light at trial and made the
strategic decision not to hide it. We agree with the post-conviction court that trial
counsel's failure to object to evidence of [] Petitioner's drug dealing was a matter
of trial strategy, which will not be second-guessed by this court. *Granderson*, 197
S.W.3d at 790.

*Johnson II*, at *22.

Petitioner has not established that this was an unreasonable application of federal law or

an unreasonable determination of the facts in light of the evidence presented. Rather, the record

supports the TCCA's finding that evidence of the fight with OJ Blair was admissible to prove

Petitioner's motive for the then-pending especially aggravated robbery charge, which was also

the predicate felony for Petitioner's felony-murder charges. The record further supports the

TCCA's finding that counsel's decision to introduce, and to not object to, evidence of

Petitioner's drug dealing was an educated, strategic decision to attempt to control the damage

that this evidence, which was going to come in regardless due to Amy Lonas and Petitioner

testifying, could otherwise cause. Like the TCCA, this Court will not second-guess that

decision.. *See Strickland*, 466 U.S. at 690–91 (noting that counsel's "strategic choices made

after thorough investigation of law and facts relevant to plausible options are virtually

unchallengeable"); *Burton v. Renico*, 391 F.3d 764, 774 (6th Cir. 2004) (holding that "strategic

choices by counsel, while not necessarily those a federal judge in hindsight might make, do not

rise to the level of a Sixth Amendment violation"). Thus, Petitioner is not entitled to relief under

§ 2254 for this claim.

### i. Conflict of Interest

In Claim 9, Petitioner claims that trial counsel had a conflict of interest because he had

previously sought to prosecute Petitioner while an Assistant District Attorney General in Monroe

County and previously represented Judge Reedy (Doc. 1, at 15–16; Doc. 2, at 110–14; Doc. 16, at 30). However, Petitioner raised this claim in his post-conviction petition (Doc. 9-30, at 101–06) but not in his appeal of the denial of that petition (Doc. 9-49). Accordingly, he procedurally defaulted this claim only in his appeal of the denial of post-conviction relief, and thus *Martinez* cannot excuse it. *See Middlebrooks*, 843 F.3d at 1136. Moreover, Petitioner has presented no other cause and prejudice to excuse this default, and the Court will not address it on the merits.

### j. Investigation and Third-Party Guilt

In Claim 10, Petitioner claims that counsel was ineffective for failing to fully investigate his case and raise the defense of third-party guilt (Doc. 1, at 16; Doc. 2, at 115–19; Doc. 16, at 31). As Respondent and Petitioner agree that this claim is fully encompassed in Claim 6 (Doc. 10, at 57; Doc. 16, at 26–28), which the Court addressed above, the Court's analysis of Claim 6 likewise governs this claim, and the Court will not otherwise address it, other than to say that Petitioner is not entitled to relief under § 2254 for this claim for the reasons set forth above.

### k. Prosecutorial Misconduct at Trial

In Claim 11, Petitioner claims that counsel was ineffective because he failed to (a) object and/or request a mistrial due to the numerous instances of prejudicial and improper comments and conduct by the prosecutor and (b) failed to raise these issues as plain error in the motion for new trial and direct appeal (Doc. 1, at 16; Doc. 2, at 119–27; Doc. 16, at 32). However, Petitioner raised these claims in his petition for post-conviction relief (Doc. 9-30, at 110–118) and defaulted them in his appeal (Doc. 9-49). Accordingly, *Martinez* cannot excuse this procedural default. *See Middlebrooks*, 843 F.3d at 1136; *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017). Moreover, Petitioner has presented no other cause and prejudice to excuse this default, as set forth above. Thus, the Court will not address the substance of these claims.

**l. Detective Wrongdoing and Communications between Detective Brumley and Judge Reedy**

In Claim 12, Petitioner claims that counsel was ineffective for failing to file a petition for writ of error coram nobis and/or failing to move to stay Petitioner's direct appeal based on Detective Brumley's wrongdoing and arguments for Judge Reedy's recusal (Doc. 1, at 16–17; Doc. 2, at 127–34; Doc. 16, at 33). Petitioner exhausted this claim with the TCCA, which analyzed it as follows:

> [] Petitioner asserts that he received ineffective assistance of counsel based on trial counsel's failure to preserve his appellate rights after the State entered the Motion to Nolle in Defendant Younger's case while [] Petitioner's direct appeal was pending in this court. Specifically, [] Petitioner asserts that he received ineffective assistance of counsel based on trial counsel's failure to raise, as plain error on direct appeal, issues relating to Detective Brumley and Judge Reedy based on the information contained in the State's Motion to Nolle. He contends that the factors for plain error review are met based on the State's assertion of "structural errors" in Defendant Younger's case. The State responds that it was a "practical impossibility" for trial counsel to make a plain error argument and obtain review under the doctrine. The State argues that, because trial counsel was unsuccessful in his Motion to Consider Post-Judgment Facts, the record did not clearly establish what occurred in the trial court as required for relief under plain error. In other words, there was no record of Detective Brumley's conduct before this court on direct appeal.
>
> When a petitioner alleges that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of that issue. *Carpenter*, 126 S.W.3d at 887 (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)). "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Further, when an omitted issue is without merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim. *Id.* at 887–88. Appellate counsel's professional judgment is entitled to considerable deference with regard to which issues best served the petitioner on appeal. *Id.* at 887.
>
> Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief [] [for] plain error

60

[], five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640–41; *see also State v. Smith*, 24 S.W.3d 274, 282–83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

The post-conviction court determined that [] Petitioner failed to establish that he would be entitled to relief under plain error review because [] Petitioner had not shown that a clear and unequivocal rule of law was breached or that a substantial right of the defendant was adversely affected. The post-conviction court noted that Judge Blackwood granted the Motion to Nolle against Defendant Younger, "focus[ing] largely on the State's right to dismiss an indictment." Judge Blackwood did not find the facts alleged in the Motion to Nolle were true and specifically stated that his ruling was not to be taken as a ruling on "the propriety of any actions that have been taken in this case[.]" Accordingly, the post-conviction court found that the trial court's order granting the motion "cannot be considered as establishing any law of the case which binds the State in defending [[]Petitioner's] current post-conviction action" and that "[] [P]etitioner's Brumley-related issues must therefore be judged on the merits as related to [[] Petitioner's] case alone."

The post-conviction court found that Detective Brumley's misdeeds, which actually led to his termination, occurred after [] Petitioner's trial and would have little, if any, weight regarding Detective Brumley's credibility at [] Petitioner's trial. The post-conviction court also determined that there was no evidence that Detective Brumley's actions in other cases affected his credibility to the point that any of [] Petitioner's substantial rights were affected in his trial. Additionally, the post-conviction court concluded that [] Petitioner's assertion that Detective Brumley coerced witness statements was "largely—if not entirely—unsupported by the record[.]"

Finally, the post-conviction court found that [] Petitioner failed to present proof to establish the purported phone calls between Detective Brumley and Judge Reedy. The post-conviction court stated that:

[n]o evidence establishing these phone calls actually took place was introduced at [[] Petitioner's] post-conviction hearing. Statements made in pleadings are not evidence, nor are arguments made at a hearing, and the factual findings at the hearing on the nolle prosequi motions in [Defendant] Younger's case do not include a clear finding these phone calls occurred.

The post-conviction court further reasoned:

. . . [E]ven if the record of these calls is to be taken as true—again, allegations contained in pleadings are generally not evidence—the record is devoid of any evidence regarding the nature and subject matter of these phone calls. Because neither Judge Reedy nor Detective Brumley testified at the post-conviction hearing, we have no insight as to the circumstances surrounding the phone calls or the subject matters discussed therein.

Accordingly, the post-conviction court found that no substantial right of [] Petitioner was adversely affected at trial and that [] Petitioner could not establish plain error.

Upon review, we agree with the post-conviction court that [] Petitioner has not established that he is entitled to relief under plain error as the record does not clearly establish what occurred in the trial court. As the State's response notes, [] Petitioner's claim raises the question of how trial counsel could have introduced the Motion to Nolle filed in Defendant Younger's case into the appellate record in his case. The appellate record provides the boundaries of an appellate court's review. *State v. Bobadilla*, 181 S.W.3d 641, 643 (Tenn. 2005). An appellate court may consider only evidence contained in the appellate record. *Id.* In this case, trial counsel attempted to present the contents of the Motion to Nolle to this court by filing a Motion to Consider Post–Judgment Facts. This court concluded that the assertions made by the prosecutor in the motion did not constitute post-judgment "facts" capable of consideration by this court under Rule 14 of the Appellate Rules of Procedure and denied trial counsel's motion. *See* Tenn. R. App. P. 14, Advisory Comm'n Cmts (stating that rule permits consideration of only those post-judgment facts "unrelated to the merits and not genuinely disputed" in order to "keep the record up to date" and "is not intended to permit a retrial in the appellate court").

Likewise, it appears that a motion to supplement the appellate record would have been unsuccessful. The procedure for correction or modification of the appellate record is set forth in Tennessee Rule of Appellate Procedure 24(e), which states:

62

If any matter properly includable is omitted from the record, is improperly included, or is misstated therein, the record may be corrected or modified to conform to the truth. Any differences regarding whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by the trial court regardless of whether the record has been transmitted to the appellate court. Absent extraordinary circumstances, the determination of the trial court is conclusive. If necessary, the appellate or trial court may direct that a supplemental record be certified and transmitted.

Tenn. R. App. P. 24(e).

However, the authority to supplement the record is limited by Rule 24(g), which provides that:

[n]othing in this rule shall be construed as empowering the parties or any court to add to or subtract from the record except insofar as may be necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal.

Tenn. R. App. P. 24(g). According to our supreme court,

any matter appropriately considered by the trial court is properly includable in the appellate record and may be added to the record . . . when such matter is "necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal."

*State v. Housler*, 167 S.W.3d 294, 298 (Tenn. 2005).

Here, [] Petitioner filed his notice of appeal in May 2010, and it was not until November 2010 that the State filed the Motion to Nolle in Defendant Younger's case. There is no indication that trial counsel was aware of the information contained in the motion while [] Petitioner's case was pending before the trial court. Further, the record contains no suggestion that the trial court knew of, reviewed, or in any way considered the allegations in the Motion to Nolle during the pendency of [] Petitioner's case. Because the assertions contained in the Motion to Nolle were not known by the trial court during the pendency of [] Petitioner's case in the criminal court, the Motion to Nolle would not be "properly

63

includable" and could not be added to the appellate record under Rule 24(e). *See State v. Rogers*, 188 S.W.3d 593, 611 (Tenn. 2006).

[] Petitioner has not explained how trial counsel could have added a matter that was never considered by the trial court or the jury to the appellate record such that it could be considered by this court. Moreover, even if trial counsel could have gotten this court to consider the pleadings in Defendant Younger's case, the allegations contained in those pleadings are not evidence[]. *Roberts*, 755 S.W.2d at 836. [] Petitioner relies on an estoppel argument, asserting that the State cannot deny the existence of the facts in the Motion to Nolle on appeal because the State was the party asserting the structural issues.

In *State v. Scarbrough*, our supreme court stated:

> The doctrine of collateral estoppel, which has its origin in civil cases, applies only when "the issue involved in the case under consideration has already been litigated in a prior suit between the same parties, even though based upon a different cause of action, if the determination of such issue in the former action was necessary to the judgment." *Dickerson v. Godfrey*, 825 S.W.2d 692, 694 (Tenn. 1992) (quoting *Home Ins. Co. v. Leinart*, 698 S.W.2d 335, 336 (Tenn. 1985)). The party who seeks to bar litigation of an issue by invoking collateral estoppel "has the burden of proving that the issue was, in fact, determined in a prior suit between the same parties and that the issue's determination was necessary to the judgment." *Dickerson*, 825 S.W.2d at 695.

181 S.W.3d 650, 654–55 (Tenn. 2005). In this case, Judge Blackwood decided that nothing in the interests of justice prevented the State from dismissing the indictment against Defendant Younger, but he did not determine that Detective Brumley and Judge Reedy had engaged in misconduct. Judge Blackwood was explicit on this point. Additionally, no evidence was introduced at the hearing on the motion such that the issues were not actually litigated and decided on the merits, and the parties are not the same. Consequently, [] Petitioner cannot satisfy the requirements of collateral estoppel.

### b. Petition for writ of error coram nobis

[] Petitioner also contends that he received ineffective assistance of counsel based on trial counsel's failure to file a petition for writ of error coram nobis based on the issues related to Detective Brumley in the Motion to Nolle. The State responds that trial counsel cannot be held deficient for failing to raise issues relating to Detective Brumley in a writ of error coram nobis petition because there

is no constitutional right to coram nobis relief and no right to counsel in such proceedings. Accordingly, trial counsel's failure to file a coram nobis petition could not amount to a constitutional violation, which is required for post-conviction relief.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (internal citation omitted). Tennessee Code Annotated section 40–26–105(b) provides that coram nobis relief is available in criminal cases as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. *Harris v. State*, 102 S.W.3d 587, 593 (Tenn. 2003).

> [I]n a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be 'reasonably well satisfied' with its veracity. If the defendant is 'without fault' in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence *may* have led to a different result.

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). In determining whether the new information may have led to a different result, the question before the court is "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the results of the proceedings might have been different." *Id.*

In limited testimony on this issue, trial counsel stated that he considered the possibility of filing a petition for writ of error coram nobis, but he did not believe

that "it was going to be enough to where the [c]ourt was going to say that . . . [[]
Petitioner] was prejudiced to the extent" required for coram nobis relief. The
post-conviction court found that a coram nobis petition would not have been
successful and that trial counsel's failure to pursue a coram nobis action did not
prejudice [] Petitioner. The post-conviction court agreed that the information in
the State's motion was "newly discovered," insofar as trial counsel did not learn
about the Detective Brumley-related issues until after [] Petitioner's trial.
However, the post-conviction court found that, had the proposed evidence
regarding Detective Brumley's misdeeds in other cases been admissible at Mr.
Johnson's trial, it would have served only to impeach his credibility, and
impeachment evidence does not entitle a petitioner to coram nobis relief. *See
Wlodarz v. State*, 361 S.W.3d 490, 499 (Tenn. 2012) ("[A]s a general rule, newly
discovered evidence which is merely cumulative or 'serves no other purpose than
to contradict or impeach' does not warrant the issuance of a writ."), *abrogated on
other grounds by Frazier v. State*, 495 S.W.3d 246, 248 (Tenn. 2016).

The post-conviction court again noted the lack of proof regarding the issues raised
in the Motion to Nolle. Regarding the supposedly coerced statement of Anita
Wilson and the circumstances under which Ms. Wilson's statement was obtained,
the post-conviction court determined that:

> the [P]etitioner offered no proof (apart from the allegation in the
> State's nolle motion in the Younger case—and as stated elsewhere,
> statements in pleadings are not evidence) regarding the statement.
> Neither Ms. Wilson, nor Detective Brumley, nor anyone else with
> knowledge of the Wilson fugitive warrant and statement testified at
> the post-conviction hearing, the statement and warrant themselves
> do not appear in the record, and in her jury-out testimony at [[]
> Petitioner's] trial Ms. Wilson did not testify regarding the
> supposed warrant or her statement implicating [Defendant]
> Younger. It is entirely possible any issues regarding Ms. Wilson
> arose after [[] [P]etitioner's trial, which would make such issues
> minimally relevant to [[] Petitioner's] trial, if such issues were
> relevant at all. A finding of limited relevance appears particularly
> appropriate given Ms. Wilson did not testify before the jury at [[]
> Petitioner's] trial.

The post-conviction court found that there was no evidence presented at the post-
conviction hearing regarding Detective Brumley's coercing other witness
statements. The court noted that Vanessa Latham testified at trial that "the
police" had threatened to have her children removed if she did not cooperate, but
she also testified that Detective Brumley was not the officer who made the

supposed threat. Regarding the issue of the purported phone calls between Detective Brumley and Judge Reedy, the post-conviction court again found that [] Petitioner presented "[n]o evidence establishing these phone calls actually took place[.]"

As noted by the State, neither the United States Constitution nor the Tennessee Constitution provides a petitioner with a constitutional right to error coram nobis relief. *Frazier*, 495 S.W.3d at 248 (citing *United States v. Morgan*, 346 U.S. 502, 506 (1954); *State v. Mixon*, 983 S.W.2d 661, 666–68 (Tenn. 1999)). Because there is no constitutional right to coram nobis relief, there is no right to counsel in such proceedings; instead, the appointment of counsel is within the discretion of the trial court. *See Lemar Brooks v. State*, No. M2010–02451–CCA–R3–PC, 2012 WL 112554, at *17–18 (Tenn. Crim. App. Jan. 11, 2012) (citing Tenn. Code Ann. § 40–14–204), *perm. app. denied* (Tenn. May 16, 2012). Therefore, this court has previously recognized that there is no constitutional right to effective assistance of counsel in a coram nobis proceeding. *Melissa Barnett v. State*, No. E2014–02396–CCA–R3–ECN, 2015 WL 5601537, at *4 (Tenn. Crim. App. Sept. 23, 2015), *perm. app. denied* (Tenn. Jan. 21, 2016). This is true even if coram nobis relief is sought while a petitioner's direct appeal is pending because the petition for writ of error coram nobis is a collateral attack on the conviction. *Lemar Brooks,* 2012 WL 112554 at *18. Accordingly, trial counsel cannot be held constitutionally deficient for failing to raise issues relating to Detective Brumley in a petition for writ of error coram nobis.

In any event, we agree with the post-conviction court that because [] Petitioner failed to offer proof of the allegations relating to Detective Brumley, [] Petitioner cannot establish prejudice resulting from trial counsel's failure to pursue coram nobis relief. [] Petitioner is not entitled to relief based on this claim.

*Johnson II*, at *23–28.

Petitioner has not established that this was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Petitioner has not set forth any way that appellate counsel could have raised a meritorious plain-error argument regarding wrongdoing by Detective Brumley and/or Judge Reedy in his direct appeal to the TCCA. Likewise, the TCCA correctly found Petitioner did not have a right to assistance of counsel for filing a coram nobis petition. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) (providing that "the right to appointed counsel extends to the first appeal of right, and no

further").  Thus, Petitioner's claim that counsel was ineffective for not filing such a petition is not cognizable under § 2254.  *Wainwright v. Torna,* 455 U.S. 586, 587–88 (1982) (holding that where there is no constitutional right to counsel there can be no deprivation of effective assistance of counsel).

As such, Petitioner is not entitled to relief under § 2254 for this claim.

### m. Investigation and Michael Cohan

In Claim 13, Petitioner claims that counsel was ineffective for failing to thoroughly investigate the case by communicating with Michael Cohan and/or timely seeking funding for the investigation (Doc. 1, at 17; Doc. 2, at 134–39; Doc. 16, at 34).  As Respondent and Petitioner agree that Claim 6, which the Court addressed above, encompassed this claim (Doc. 10, at 57; Doc. 16, at 34), that analysis also governs this claim, and the Court will not otherwise address it, except to say that Petitioner is not entitled to relief under § 2254 for this claim for the reasons set forth above.

### n. *Cronic* Claim

In Claim 14, Petitioner claims that Counsel was ineffective in a manner that results in a presumption of prejudice under *United States v. Cronic*, 466 U.S. 648 (1984) due to his failure to engage and obtain additional funding for the investigator (Doc. 1, at 17; Doc. 2, at 139–41; Doc. 16, at 35–36).  In *Cronic*, the Supreme Court provided that courts will presume prejudice under *Strickland* to a defendant where:  (1)  the record establishes a "complete denial of counsel," including where counsel is denied a "critical stage,"; (2) where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing,"; and (3) in situations where "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate."  *Id.* at 659–60.  Even if the Court assumes

*Martinez* could excuse Petitioner's procedural default of this claim,[7] the record establishes that Petitioner is not entitled to relief under *Cronic*.

Specifically, it appears from his filings that Petitioner asserts that he is entitled to a presumption of prejudice under the first prong of *Cronic* because he was completely denied counsel during the discovery and/or investigation phase of his case. But even if the Court assumes that the discovery and/or investigation phase is a "critical stage" of proceedings that could entitle Petitioner to a presumption of prejudice under *Cronic*, Respondent correctly points out that the record establishes that Petitioner's counsel engaged in at least some discovery and investigation, including meeting with Petitioner, witnesses, and the investigator (Doc. 9-39, at 120–27).

Thus, Petitioner has not established a complete denial of his right to counsel during a critical stage of his criminal proceedings, and he is not entitled to relief under § 2254 under *Cronic*.

### o. Constructive Amendment of the Indictment and Proof

In Claim 15, Petitioner asserts that counsel was ineffective for failing to object, request a mistrial, and raise as plain error in the motion for new trial and on direct appeal the prosecutor's argument and proof that constructively amended the indictment, and failed to argue to the jury that the proof did not meet the requirements to convict him (Doc. 1, at 17–18; Doc. 2, at 141–46; Doc. 16, at 36–37). But Petitioner raised this claim in his petition for post-conviction relief (Doc. 9-30, at 130–34) and did not raise it in his appeal (Doc. 9-49). Thus, Petitioner

---

[7] As Respondent correctly notes, the Sixth Circuit recently stated that "[i]t is doubtful that the *Martinez* exception, which the Supreme Court has repeatedly characterized as a 'narrow' one, . . . could apply to excuse a habeas petitioner's default of an underlying *Cronic* claim." *Carruthers v. Mays*, 889 F.3d 273, 288 (6th Cir. 2018)

procedurally defaulted this claim, and *Martinez* cannot excuse this procedural default.

*Middlebrooks v. Carpenter*, 843 F.3d 1127, 1136 (6th Cir. 2016); *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017). Moreover, Petitioner has presented no other cause and prejudice to excuse this default. As such, the Court will not address it on the merits.

### p. Fatal Variance

In Claim 16, Petitioner asserts that counsel was ineffective for failing to object, request a mistrial, and raise as plain error in the motion for new trial and on direct appeal the fatal variance between the indictment and the proof presented at trial. (Doc. 1, at 18; Doc. 2, at 146–54; Doc. 16, at 37–38). However, Petitioner raised this claim in his petition for post-conviction relief (Doc. 9-30, at 134–142) and defaulted it in his appeal of the court's denial of this relief (Doc. 9-49). Accordingly, *Martinez* cannot excuse this procedural default. *See Middlebrooks*, 843 F.3d at 1136; *Davila*, 137 S. Ct. at 2067. Moreover, Petitioner has presented no other cause and prejudice to excuse this default, as set forth above. Thus, the Court will not address the substance of this claim.

### q. Disqualification of Bradley County District Attorney's Office

In Claim 17, Petitioner claims that his counsel was ineffective for not moving to dismiss the indictment and/or seeking disqualification of the Bradley County District Attorney's Office (Doc. 1, at 18; Doc. 2, at 154–59; Doc. 16, at 38–40). In support of this assertion, Petitioner relies on a pretrial memorandum from Mr. Cohan indicating that Steve Bebb, a Bradley County District Attorney involved in prosecuting Petitioner for the 1999 murders, was at one point very close to Petitioner due to Petitioner's high school friendship with Mr. Bebb's son (Doc. 2, at 156–57). The memorandum further indicates that, according to Petitioner, Mr. Bebb was noticeably angry and upset with him during two later interactions between the two of them,

specifically (1) a criminal proceeding against Petitioner wherein Mr. Bebb was the judge, and (2) an interview with Petitioner about the 1999 murders wherein Mr. Bebb was a prosecutor (*Id.*). The memo thus suggests that Mr. Bebb may have a conflict in Petitioner's case, and that he and/or his family members could be mitigation witnesses for Petitioner (*Id.* at 158). Based on this memo, Petitioner asserts that the indictment against him was due to Mr. Bebb's "disappointment and hatred" of him, rather than justice, and trial counsel was deficient for not moving to dismiss the indictment and/or to disqualify the Bradley County District Attorney's Office from prosecuting the case against him, even though Petitioner acknowledges that Mr. Bebb withdrew from working on the criminal case against due to this conflict at an unspecified time (*Id.* at 155).

However, as to Petitioner's argument that counsel was deficient for not moving to dismiss the indictment against him, Petitioner has not established that the indictment resulted from any prosecutorial misconduct that violated his right to due process, prejudiced him, or affected the grand jury's decision, as Tennessee law required at the relevant time for dismissal of an indictment due to prosecutorial misconduct. *State v. Culbreath*, 30 S.W.3d 309, 317 (Tenn. 2000). Petitioner's counsel was not required to make a meritless argument. *Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999). Thus, this claim has no merit.

Moreover, Petitioner's allegations that he had a close relationship with Mr. Bebb many years before his indictment and prosecution for the 1999 murders and that Mr. Bebb exhibited noticeable anger during two later encounters with Petitioner during criminal proceedings where they were both present, including in an interview with Petitioner regarding the 1999 murders, are insufficient to establish that a conflict of interest existed on the part of Mr. Bebb that would have disqualified the Bradley County District Attorney's Office. *State v. Tate*, 925 S.W.2d 548, 556

71

(Tenn. Crim. App. 1995) (noting that, under Tennessee law, "where one district attorney has a conflict of interest, the entire district attorney general's office need not be disqualified so long as the attorney at issue does not disclose confidences or otherwise participate in the prosecution"). Again, counsel cannot be constitutionally ineffective for not raising a meritless argument. *Mapes*, 171 F.3d at 427.

Thus, Petitioner is not entitled to relief under § 2254 for this claim.

### r.  Challenge Indictment

In Claim 18, Petitioner asserts that counsel was ineffective for not moving to dismiss Counts 4 and 5 of his indictment and/or challenge these counts by arguing that they were insufficient, duplicitous, and/or violated the principles of double jeopardy and/or that the prosecution relied on an improper factual predicate of a robbery against OJ Blair and that neither female victim's property was the subject of a robbery (Doc. 1, at 18–19; Doc. 2, at 159–68; Doc. 16, at 40–41).  Petitioner specifically argues that the portions of the indictment charging him with the murders of the two females improperly relied on his alleged robbery of OJ Blair, and thus amounted to double jeopardy, and that counsel was deficient for not making this argument (Doc. 2 , at 159–68).

The Double Jeopardy clause of the Fifth Amendment, which applies to the states through the Fourteenth Amendment, provides that a person may not "be subject for the same offence to be twice put in jeopardy of life of limb."  U.S. Const. amends. V, XIV.  It protects, among other things, "against multiple punishments for the same offense" in a single proceeding.  *Missouri v. Hunter*, 459 U.S. 359, 366 (1983) (citation omitted).  The test to determine whether the punishment of one course of conduct under two different statutes violates double jeopardy is

whether each provision requires proof of a fact which the other does not. *Id*. (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

The indictment against Petitioner did not put him in jeopardy more than once for the same offense. Rather, as set forth above, Petitioner's indictment charged him with one count of especially aggravated robbery based on an alleged taking of property from OJ Blair, and three counts of felony murder of three separate victims during that robbery. While the three murder charges in the indictment were all predicated on the same alleged robbery of OJ Blair underlying the especially aggravated robbery charge, the felony-murder counts of the indictment each charged that Petitioner committed a separate murder, and the charges in the indictment therefore required proof that Petitioner committed three separate murder offenses during a robbery or attempted robbery.

Thus, Petitioner's argument that his indictment violated his Fifth Amendment Rights or was otherwise improper because the felony-murder counts and the especially aggravated robbery counts relied on one act of robbery is without merit, counsel cannot be faulted for failing to make it, and Petitioner is not entitled to relief under § 2254 for this claim

### 3. *Brady* Claims

In Claims 19, 20, 21, 22, and 23, Petitioner alleges that the prosecution violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963) by suppressing various evidence. However, as set forth above, Petitioner procedurally defaulted these claims and has not set forth cause and prejudice to excuse that default. Accordingly, the Court will not address them on the merits.

### 4. Structural Error

In Claim 24, Petitioner claims that the relationship and/or communications between Judge Reedy and Detective Brumley caused structural error in his trial that violated his due

process rights (Doc. 1, at 21; Doc. 2, at 179–84; Doc. 16, at 57–58). In support thereof, Petitioner alleges that, after his trial, evidence of communications between Detective Brumley and Judge Reedy by phone and text during his trial were discovered, as was evidence that they were neighbors, of other wrongdoing on the part of Detective Brumley, and of the fact that Judge Reedy knew Twanna Blair's family (Doc. 2, at 179–184). Petitioner exhausted this claim with the TCCA under the theory that the factors cited in the prosecution's motion to nolle prosequi the charges against Michael Younger established a structural error based on a lack of judicial impartiality in Petitioner's case, which the state could not deny under the doctrine of collateral estoppel (Doc. 9-49, at 72–77).

As set forth above, in its analysis of Petitioner's claim that counsel was ineffective for not bringing the facts of the *Younger* nolle prosequi motion into Petitioner's direct appeal, the TCCA rejected Petitioner's argument that the prosecution's statements in the *Younger* nolle prosequi motion also bound the prosecution in Petitioner's case under the doctrine of collateral estoppel. *Johnson II*, at *26 (holding that "no evidence was introduced at the hearing on the motion [to nolle prosequi the charges against Michael Younger] such that the issues were not actually litigated and decided on the merits, and the parties are not the same. Consequently, [] Petitioner cannot satisfy the requirements of collateral estoppel"). The TCCA likewise denied Petitioner's structural error claim because he did not present any evidence of improper communications between Judge Reedy and Detective Brumley and/or of other incidents that compromised the integrity of the criminal proceedings against him. *Id.* at *28–29. Specifically, the TCCA stated as follows with regard to this claim:

> The post-conviction court addressed the Petitioner's claim of structural error, stating:

Issues regarding Detective Brumley, including his supposed lack of credibility and allegations he coerced several witness statements, have been reviewed in great detail elsewhere and found not to constitute reversible error. For the reasons stated in those other sections, the Court concludes [those] Brumley-related issues do not constitute structural error. The Court will therefore confine its review of the structural error issue to [] [P]etitioner's allegations of inappropriate contact between Detective Brumley and [Judge Reedy].

In support of the structural error claim relative to this issue, the [P]etitioner cites to the list of telephone calls between phone numbers associated with [Judge Reedy] and [D]etective [Brumley], as well as Brumley's purported comments to the former District Attorney regarding advice a "little birdy" (possibly [Judge Reedy]) had passed along to the detective.

. . . .

[I]f [Judge Reedy] acted as the State alleged in the [Motion to Nolle], such actions may be improper under the code of judicial conduct, and this Court's conclusions should not be seen as an excuse of such potential conduct. However, as stated elsewhere in this order, there is no proof in the record to substantiate [] [P]etitioner's assertion the trial judge's potential misconduct affected the integrity of these trial proceedings.

Accordingly, the post-conviction court concluded that [] Petitioner's structural error claims were without merit.

Upon review, we agree with the post-conviction court's findings and analysis. [] Petitioner has not shown that the Detective Brumley-related issues constitute structural error requiring reversal of his convictions. [] Petitioner offered no proof of any telephone calls between Detective Brumley and Judge Reedy. Although the State alleged such conduct in its Motion to Nolle and attached a purported call log as "EXHIBIT 1" to the motion, allegations contained in pleadings are not evidence. *Roberts*, 755 S.W.2d at 836. Likewise, [] Petitioner offered no proof about the alleged coercion of witness Anita Wilson, making it "entirely possible any issues regarding Ms. Wilson arose after [] [P]etitioner's trial, which would make such issues minimally relevant to [[]Petitioner's] trial, if such issues were relevant at all." We also agree with the post-conviction court that, if the proposed evidence regarding Detective Brumley's misdeeds in other

75

cases had been admissible at [] Petitioner's trial, it would have served only to impeach the detective's credibility. *See Wlodarz*, 361 S.W.3d at 499. Accordingly, the Petitioner has failed to establish structural error in his trial.

*Johnson II*, at *29.

Petitioner has not established that this was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Under federal law, "[t]he defining feature of a structural error is that it "affect[s] the framework within which the trial proceeds," rather than being "simply an error in the trial process itself." *Weaver v. Mass.*, 137 S. Ct. 1899, 1907 (2017). "Due process requires a fair trial before a judge without actual bias against the defendant or an interest in the outcome of his particular case." *United States v. Armstrong*, 517 U.S. 456, 468 (1996). Accordingly, judicial bias is one example of structural error that is not subject to harmless error analysis. *Railey v. Webb*, 540 F.3d 393, 399 (6th Cir. 2008). "Judicial bias has traditionally been proved by citation to facts external to the judicial proceedings in question, such as a judge's pecuniary or personal interest in the outcome of the proceedings before her." *Mason v. Burton*, 720 F. App'x 241, 245 (6th Cir. 2017) (citing *In re Murchison*, 349 U.S. 133 (1955).!

However, as "[b]ias is easy to attribute and difficult to discern," the Supreme Court has stated that the courts must determine whether "as an objective matter, "the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (citations omitted). The Supreme Court therefore has dictated that the relevant question in examining a due process claim based on judicial bias is whether "'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Rippo v. Baker*, 137 S. Ct. 905, 907 (2017) (quoting *Withrow v. Larkin,* 421 U.S. 35, 47, (1975)).

The record establishes that, in Michael Younger's case, the prosecution admitted that Judge Reedy and Detective Brumley consistently spoke on the phone about unknown matters, including before Petitioner's trial. Specifically, the prosecution acknowledged seventy-eight phone calls between Detective Brumley and Judge Reedy between October 6, 2008, the date of Petitioner's indictment (Doc. 9-1, at 5), and August of 2009, the month in which Petitioner's trial started. *Johnson II*, at *9 n. 5. However, no such phone calls occurred during Petitioner's trial. *Id.*

In his § 2254 memorandum, Petitioner directs the Court to review the phone records and documents from Mr. Younger's trial that he filed in support of this claim with his initial post-conviction petition (Doc. 2, at 180). But while these filings (Doc. 9-25, at 149-51; Doc. 9-26; Doc. 9-27; Doc. 9-28; Doc. 9-29, at 1–59) contain a log of calls purported to be between Judge Reedy and Detective Brumley and months of Detective Brumley's phone bills, like the TCCA, the Court has not located any sworn or authenticated proof therein of the existence of any phone calls between Judge Reedy and Detective Brumley, or the contents thereof. Moreover, while the *Younger* nolle prosequi motion references other incidents of Detective Brumley's wrongdoing before and after Petitioner's trial that the Court has addressed above, nothing in the record indicates that these other incidents of wrongdoing are relevant to this claim. Petitioner likewise has not identified other incidents during Mr. Younger's trial or prosecution that are relevant to this claim.

Thus, the Court will focus on the purported phone calls between Judge Reedy and Detective Brumley in examining this claim. As set forth above, Petitioner's post-conviction counsel argued that, as the prosecution acknowledged in the *Younger* nolle prosequi motion that the phone calls between Judge Reedy and Detective Brumley during the criminal proceeding

against Mr. Younger established that further pursuit of those charges would violate Mr. Younger's due process rights, the prosecution could not deny that the phone calls between Judge Reedy and Detective Brumley during Petitioner's case likewise established structural error in Petitioner's case under the doctrine of collateral estoppel (Doc. 9-49, at 72–77). *Id.* at *26, *28–29. He thus did not present proof of these communications or their contents in Petitioner's post-conviction proceedings.

In other words, even though Petitioner was aware of the allegations regarding the communications between Judge Reedy and Detective Brumley during his post-conviction proceeding, and therefore could have presented evidence that those communications may have justified a finding of constitutionally intolerable risk of actual judicial bias in his case by calling Judge Reedy and/or Detective Brumley to testify at the hearing in the proceeding, he did not do so. Instead, he chose to rely on the unmeritorious theory that the *Younger* nolle prosequi motion established structural error in his case under the collateral estoppel doctrine. Accordingly, due to the lack of any evidence of these communications or their content in the record, the Court will not speculate that any communications between Judge Reedy and Detective Brumley are grounds to grant Petitioner § 2254 relief based on structural error.

Further, while Petitioner seeks to challenge Judge Reedy's impartiality during his trial based on her alleged improper communications and/or relationships with witnesses or families of witnesses, including but not limited to Detective Brumley, he has not cited any incidents in which Judge Reedy was unfair to him in his trial, and the record fully supports Petitioner's counsel's testimony at his post-conviction hearing that Judge Reedy was harder on the prosecution than she was on his defense.

Accordingly, Petitioner is not entitled to relief under § 2254 for this claim.

## IV.    CONCLUSION

For the reasons set forth above, the petition for habeas corpus relief under § 2254 will be **DENIED** and this action will be **DISMISSED**.

## V.    CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA"), should Petitioner file a notice of appeal.  Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right.  *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.  When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Reasonable jurists could not conclude that Petitioner has made a substantial showing of a denial of a constitutional right for his sufficiency of the evidence, ineffective assistance of counsel, or structural error claims addressed on the merits above such that they would be adequate to deserve further review.  Moreover, jurists of reason would not disagree with the Court's finding that Petitioner procedurally defaulted the claims that he did not present to the TCCA.  Accordingly, a **COA SHALL NOT ISSUE.**  Also, the Court **CERTIFIES** that any

79

appeal from this action would not be taken in good faith and would be totally frivolous.  Fed. R. App. P. 24.

**AN APPROPRIATE ORDER WILL ENTER.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**